ALBERT ZABIN & others[1] *vs.* STEFANO PICCIOTTO & others[2]
(and a companion case[3]).

Nos. 06-P-1419 & 07-P-842.

Suffolk. March 19, 2008. - November 18, 2008.

Present: GREEN, GRAHAM, & GRAINGER, JJ.

*Jurisdiction. Judgment,* Implementing settlement agreement. *Evidence,* Relevancy and materiality, Medical record. *Contract,* Settlement agreement, Compensation of attorney, Contingent fee agreement. *Attorney at Law,* Attorney-client relationship, Compensation, Contingent fee agreement. *Damages,* Quantum meruit, Interest. *Interest. Privileged Communication. Waiver. Practice, Civil,* Interest, Deposition, Discovery, Assistance of counsel, Transcript of testimony, Record. *Due Process of Law. Consumer Protection Act,* Unfair or deceptive act.

This court had jurisdiction to consider an appeal in a civil action where a final judgment resolving all claims among the parties had entered in the lower court. [147-148]

In a civil action involving, inter alia, a dispute concerning the proceeds of a certain settlement, the judge did not abuse his discretion in denying the defendants' late-trial request to submit to the jury the question of their respective entitlement to the settlement proceeds and to amend the pleadings to incorporate such a claim. [148-149]

In a civil action, the judge did not abuse his discretion in excluding from evidence an agreement entered into among related parties concerning the allocation of certain settlement proceeds, where the agreement could have tended to mislead rather than illuminate the jury as to the value of two of the defendants' claims and their respective shares of the settlement proceeds [150-152], and where, even if the exclusion were erroneous, it occasioned little or no consequence to the jury's consideration of the various plaintiffs' claims [152-155].

---

[1]Schneider, Reilly, Zabin & Costello, P.C.; Joel Eigerman; Michael Gilleran; Gilleran & Mortensen, P.C.; Pepe & Hazard LLP; Edwin McCabe; McCabe Brown & Davis, P.C.; and Edward Greer.

[2]Judith Picciotto, Melita Picciotto, Athena Picciotto, and Foreign Car Center, Inc. Juan Nunez was a plaintiff in the underlying action but did not participate in this appeal.

[3]The defendant Melita Picciotto also appeals from an order of the single justice entered on May 1, 2007. That appeal is entered on the docket of this court as no. 2007-P-842.

The judge in a civil action properly awarded prejudgment interest under G. L. c. 231, § 6C, to the plaintiffs on claims for attorney's fees based in quantum meruit. [155-157]

In a civil action involving malpractice claims by clients against their former attorneys, there was no merit to the defendants' argument that the judge erred in allowing the plaintiffs to take the deposition of the defendants' trial counsel, where the defendants' allegations placed the work their trial counsel performed in the underlying litigation directly at issue, and she was the only source available to testify regarding the work she performed [157-158]; further, the judge did not abuse his discretion in allowing the plaintiffs' motion to offer in evidence portions of the transcript of the trial counsel's deposition testimony [158].

The judge in a civil action was within his discretion in ordering one of the defendants to consent to the release of his medical records, where the records were relevant to issues in the case; moreover, that defendant's continued defiance of the judge's order subjected him to sanctions, the extended imposition of which on other members of that defendant's family did not prejudice them. [159-160]

In a civil action, the judge did not abuse his discretion in excluding evidence that was speculative, contained inadmissible material, or was not relevant. [160-162]

In a civil action, there was no merit to the defendants' claim that the judge precluded one of their expert witnesses from offering certain opinions. [162-163]

In an action involving, inter alia, claims of malpractice against certain attorneys, the judge did not err in permitting one of the attorneys to offer his opinion that the clients' claims in the underlying action were without merit, where the testimony was relevant and material to the claim against that attorney, as were the grounds for his conclusion, and where his testimony was subject to cross-examination. [163-164]

The defendants in a civil action failed to demonstrate that the claimed deprivations of due process, viewed individually or collectively, required a new trial. [164-167]

In a civil action, the judge did not err in dismissing the defendants' counterclaims against one of the plaintiffs, where it was for the jury to weigh any conflicting evidence. [167-168]

The judge in a civil action properly dismissed an attorney's claims under G. L. c. 93A against a former client based on its failure to pay him for legal services rendered to it, where, pending final judgment in the present litigation, the client was not in breach of its agreement with the attorney, much less guilty of unfair or deceptive acts or practices by reason of its failure to pay him. [168-171]

No error arose in a civil action from the judge's reconstruction of testimony missing from the record due to the official court reporter's having misplaced her audiotapes for two dates of the trial, where there was no showing that the court intentionally falsified the record. [172]

A Superior Court judge properly disposed of a motion brought by the defendants in a civil action to modify the record, where he denied the motion insofar as it sought to add four particular documents to the record, and where no correction of alleged errors in the record was warranted. [172-173]

This court reinstated as part of the record appendix on appeal in a civil action

a certain motion that a single justice of this court allowed to be struck from the record appendix. [173-174]

No sustainable claim of error was made by one of the defendants in a civil action, based on the refusal of a single justice of this court to remand a companion case to the Superior Court for adjudication of a certain issue, where the pleadings included no request for such adjudication. [174]

CIVIL ACTION commenced in the Superior Court Department on April 7, 1999.

The case, as superseded by separate complaints filed by the various plaintiffs, was tried before *Mitchell J. Sikora, Jr.*, J., and was later consolidated with an appeal from an order of a single justice entered by *McHugh*, J.

*Melita Picciotto*, pro se.

*George E. Richardson* for Foreign Car Center, Inc.

*Danielle E. de Benedictis* for Athena Picciotto.

*Timothy J. Dacey* (*Douglas K. Mansfield, Thomas J. Gallitano, & Scott D. Burke* with him) for Edward Greer & others.

*Michael J. Stone* (*Susan E. Cohen* with him) for Schneider, Reilly, Zabin & Costello, P.C., & another.

*Timothy O. Egan* (*Robert T. Gill* with him) for Joel Eigerman & another.

*Judith Picciotto*, pro se, was present but did not argue.

*Stefano Picciotto*, pro se, was present but did not argue.

GREEN, J. Following a lengthy trial, a Superior Court jury returned a verdict in favor of the plaintiffs on their respective claims for recovery of attorney's fees, and against the defendants on their counterclaims for malpractice and related claims. Thereafter, the trial judge (who had reserved the parties' claims and counterclaims under G. L. c. 93A) ruled that the various c. 93A claims should be dismissed. On appeal, the defendants raise numerous claims of error. In addition, the plaintiff Joel Eigerman asserts that the judge erred in concluding as matter of law that an attorney may not maintain an action against a former client under c. 93A, based on actions arising out of the former attorney-client relationship. We discern in the defendants' various claims of error no grounds for reversal of the judgment in the plaintiffs' favor on their claims for attorney's fees, and accordingly affirm the judg-

ment as to such claims. We likewise affirm the judgment in the plaintiffs' favor on the defendants' various counterclaims. We affirm the judgment in favor of the defendant Foreign Car Center, Inc. (FCC), on Eigerman's claim under c. 93A, though we do so on grounds other than those relied upon by the trial judge. Finally, we affirm the orders of the single justice that are before us, with one modification.

1. *Background.* We summarize briefly the tortuous history of the litigation preceding the present appeal, to furnish context for our review of the trial itself. On March 24, 1983, FCC, its owners Stefano Picciotto and his wife, Judith Picciotto,[4] and FCC employee Juan Nunez filed a complaint in the Superior Court, alleging that they had sustained damages during the late 1970s and early 1980s, as a result of emissions from the operations of a leather finishing plant operated by Salem Suede, Inc. (Salem Suede), on property adjacent to FCC.[5] After a lengthy period of dormancy, a jury trial in September, 1993, produced a verdict in their favor, and awarded them substantial damages.[6] The judgment was affirmed on appeal, and we refer to the opinion in that appeal for further description of the facts underlying the 1983 complaint. See *Foreign Car Center, Inc.* v. *Salem Suede, Inc.*, 40 Mass. App. Ct. 15 (1996).

The plaintiff Albert Zabin served as trial counsel in the 1983 action, under a written contingent fee agreement. In 1994, after judgment entered in the 1983 action but before disposition of the appeal, Stefano asked Zabin to file a complaint against Salem Suede based on injuries suffered by his daughters, the defendants Melita and Athena. Zabin filed a complaint but withdrew his appearance when Stefano failed to provide him with medical records substantiating the claimed injuries.

In April, 1996, after this court affirmed the judgment in the 1983 action and the Supreme Judicial Court denied Salem Suede's application for further appellate review, Zabin filed suit against Salem Suede and The Travelers Indemnity Company, Inc. (Travel-

---

[4] Where necessary, we will refer to the members of the Picciotto family by their first names, not out of disrespect but in the interest of clarity.

[5] Another FCC employee, Jose B. Ferreras, joined in the 1983 complaint but is not a party to the present action.

[6] With prejudgment interest, the damages totaled $1,296,641.

ers), seeking to collect the judgment, and claiming that Travelers had engaged in unfair claims settlement practices. After Salem Suede sought protection by means of a petition under Chapter 11 of the Bankruptcy Code, the Picciottos filed an action for legal malpractice against Zabin. Zabin withdrew as their counsel, and the Picciottos engaged the plaintiff Joel Eigerman to represent them in the bankruptcy action. By early 1997, Eigerman's relationship with the Picciottos had deteriorated, and the bankruptcy judge granted him leave to withdraw as their counsel. The Picciottos engaged the plaintiff Michael Gilleran in replacement. In April, 1997, Travelers moved for summary judgment on the grounds that the Picciottos' claims were excluded from coverage under a pollution exclusion clause contained in Salem Suede's policy with Travelers. In October, 1997, the bankruptcy judge denied Travelers's summary judgment motion, citing disputed issues of fact material to the application of the pollution exclusion clause to the Picciottos' claims. In her memorandum of decision, the bankruptcy judge offered extensive commentary adverse to Travelers relative to the unfair claims settlement practices issue.

During the summer of 1997, while awaiting the bankruptcy judge's decision on Travelers's summary judgment motion, the Picciottos asked Gilleran to file a proof of claim in the Bankruptcy Court on behalf of Melita and Athena. After Gilleran did so, the court scheduled an evidentiary hearing to estimate the value of the claims. Gilleran engaged a personal injury attorney to assist him in presenting evidence on the claims. However, after reviewing available records, the attorney advised Gilleran that he could find no evidence that Melita or Athena had been injured by emissions from Salem Suede. As with his predecessor counsel, Gilleran's relationship with the Picciottos deteriorated, and in January of 1998, the Picciottos sent Gilleran a letter accusing him of legal malpractice in his representation of them. Gilleran was granted leave to withdraw as counsel and was replaced by the plaintiff Edwin McCabe.

McCabe's relationship with the Picciottos was short lived and marked by friction. In May of 1998, he was granted leave to withdraw, and the Picciottos engaged attorney Dana Casher to replace him.[7]

---

[7]Casher also represented the Picciottos through trial in the present action.

In June, 1998, the United States District Court for the District of Massachusetts rejected Travelers's appeal from the Bankruptcy Court's denial of summary judgment. See *In re Salem Suede, Inc.*, 221 B.R. 586 (Bankr. D. Mass. 1998).

On January 6, 1999, Travelers agreed to pay to the Picciotto parties (including Juan Nunez) a lump sum of $9 million, in full settlement of all claims against Travelers, Salem Suede, and all affiliates of Salem Suede (including Salem Suede's owner, Alan Zion). The settlement was reflected in a written settlement agreement, executed by Travelers, Salem Suede, Zion, and the defendants and Juan Nunez.[8] As a condition precedent to payment of the settlement, the settlement agreement required the defendants to resolve any outstanding claim that might constitute a lien on the settlement proceeds, including any claims for attorney's fees. Settlement efforts with the plaintiffs were unsuccessful, and Travelers on April 7, 1999, filed an action for interpleader to resolve the competing claims to the proceeds.[9]

After the plaintiffs and defendants filed responsive pleadings to Travelers's interpleader complaint, asserting a variety of claims and cross claims, a judge of the Superior Court entered an order realigning the parties and directing them to file new pleadings. The purpose of the order appears to have been to streamline the action, by framing the claims for attorney's fees by the plaintiffs and the counterclaims for legal malpractice by the defendants. The parties other than Travelers were directed to file and serve new pleadings, setting forth their respective claims. The attorneys

---

[8]A variety of other parties affiliated with Zion and/or Salem Suede also joined in the settlement agreement. Their identities are not germane to any issue in this appeal.

[9]In 1994, Stefano and Judith engaged the plaintiff Edward Greer to bring an action against BayBank and Alan Zion (Salem Suede's owner), seeking damages arising from an alleged conspiracy incident to BayBank's efforts to collect a loan extended by the bank to FCC and secured by the Picciottos' home. Dissatisfied with Greer's representation, the Picciottos discharged him and engaged the plaintiff Joel Eigerman. Eventually, BayBank obtained a summary judgment, which this court affirmed on appeal. See *Picciotto* v. *Bay-Bank*, 46 Mass. App. Ct. 1119 (1999). The threatened foreclosure was delayed during the pendency of the action (including the appeal). Stefano and Judith used a portion of the proceeds of the Travelers settlement, released apparently pursuant to an amendment to the original settlement agreement, to satisfy the BayBank debt and avoid foreclosure. Over the course of proceedings in the Superior Court, a total of $4.25 million was released to the Picciotto parties.

(and their law firms) were directed to file their claims as complaints; the Picciottos, FCC, and Nunez were directed to file answers to the plaintiffs' claims, together with any counterclaims they wished to pursue. Travelers was dismissed from the action. The court retained custody of the settlement proceeds, which were invested in interest-bearing instruments.

Following extensive discovery, trial began on September 20, 2001, and lasted sixty-three days.[10] On January 5, 2002, the jury returned a verdict awarding fees to the plaintiffs and rejecting the defendants' various counterclaims. Thereafter, the trial judge entered findings and rulings on the parties' claims under G. L. c. 93A, rejecting all such claims.[11] Final judgment on the various claims entered accordingly, and these appeals followed.[12] We address the parties' various claims of error in turn.

2. *Jurisdiction.* Before addressing the parties' substantive claims of error, we consider a matter of procedure. The defendants contend that we are without jurisdiction to consider this appeal, because no final judgment entered in the trial court. They observe that the interpleader complaint filed by Travelers named as a party Warren Five Cents Savings Bank (which had filed a lien against the settlement to secure a judgment it held against FCC), but that the judgment that entered did not resolve that claim. There is no merit to the contention. As we have explained, the initial interpleader complaint was superseded by separate complaints filed by the various plaintiffs. Warren Five Cents Sav-

---

[10]Prior to trial, the judge allowed the plaintiffs' motions for summary judgment, dismissing the defendants' claims for abuse of process and civil rights violations, and dismissing the defendants' claims against the law firm of Thornton & Early. The propriety of the latter ruling is not at issue in this appeal.

[11]The judge rejected the defendants' claims outright. As to the plaintiffs' claims, the judge found that the defendant FCC had engaged in unfair and deceptive acts or practices against the plaintiffs, but concluded that an attorney may not maintain an action under G. L. c. 93A against a former client for actions arising out of the attorney-client relationship.

[12]During the pendency of the appeal from the judgment, the Picciottos filed several interlocutory appeals with the single justice. Melita's appeal from an order of the single justice entered on May 1, 2007, is entered on the docket of this court as no. 2007-P-842. See note 3, *supra.* The defendants' appeals from two other orders of the single justice, allowing motions by the plaintiffs to strike certain materials from the record appendix, were consolidated with the appeal from the judgment.

ings Bank did not file a complaint and was not a party to the action as it proceeded thereafter. The judgment disposed of all claims among the parties to the resulting action and constitutes a final judgment.[13] The appeal is properly before us.[14]

3. *Allocation of settlement proceeds among defendants.* The defendants advance several separate claims of error arising from the allocation (as among the defendants) of portions of the proceeds of the Travelers settlement. Incident to the settlement with Travelers, the defendants (and Juan Nunez) entered into an agreement with each other, allocating the respective entitlement of each to the settlement proceeds (allocation agreement). The settlement agreement itself made no such allocation; it provided for payment of the lump sum of $9 million to Casher on behalf of the collective defendants.[15] The defendants' joint answer to Travelers's interpleader complaint made no request for a determination of the separate portions of the settlement due to each or any of them. Similarly, their answers and counterclaims filed in response to the plaintiffs' complaints requested no such determination.

Prior to the commencement of trial, an attorney for Melita and Athena filed a motion seeking release of the portions of the settlement proceeds allocated to them under the allocation agreement, claiming that the failure to release such proceeds constituted a deprivation of their property in violation of their right to due process. Midway through trial, Casher sought to introduce the allocation agreement to establish the entitlement of each defendant to the settlement proceeds, and to argue that the attorneys' liens could not attach to the portions allocable to Melita and Athena (except to the extent of the relatively modest fees claimed against

[13]Moreover, as observed by the single justice in his consideration of the issue, any claim by Warren Five Cents Savings Bank is wholly derivative (by assignment) of rights held by FCC, and as such is not essential to resolution of any competing claims of the parties to the settlement proceeds.

[14]There is likewise no merit to the separate contention that the judgment is not final because it did not determine the portions of the settlement proceeds allocable to each of the respective defendants. As discussed *infra*, the defendants' pleadings did not request that such an allocation be made, and the judgment is accordingly not deficient or incomplete for its failure to make one.

[15]The settlement agreement included a reference to the allocation of proceeds among the parties: it stated that "[t]he allocation of such payments among the Judgment Creditor Interests shall be disclosed if and as required by the Court." Travelers did not, however, join in the separate allocation agreement.

them).[16],[17] Late in the trial, after the trial judge had ruled that the allocation agreement could not be submitted in evidence, Casher sought to introduce evidence of the injuries allegedly suffered by Melita and Athena, for the purpose of establishing that their claims had value and that, accordingly, some portion of the $9 million settlement proceeds was allocable to their claims rather than the claims of the other defendants. Thereafter, the defendants moved to amend their pleadings "to conform to the evidence," seeking to incorporate a request to determine their separate entitlements to portions of the settlement proceeds; on appeal they claim error in the denial of that motion.

The judge did not err in rejecting the defendants' late-trial request to submit to the jury the question of their respective entitlements to the settlement proceeds. Their pleadings contained no such claim, and the judge was well within his discretion in rejecting (on grounds of tardiness) their motions to amend the pleadings, filed on the fifty-third and fifty-ninth days of the sixty-three day trial.[18] See *Castellucci* v. *United States Fid. & Guar. Co.*, 372 Mass. 288, 292 (1977).

---

[16]According to an offer of proof submitted by Casher on the thirty-seventh day of trial, the allocation agreement allotted $4 million to Stefano and Judith and FCC, collectively; $3 million to Juan Nunez (an FCC employee); $1.5 million to Melita; and $500,000 to Athena. To the extent that any claim of error rests on the contention that the attorneys' liens could not attach to the portions of the settlement proceeds allocable to Melita and Athena, it is moot. As we have noted, see note 9, *supra*, a total of $4.25 million of the $9 million proceeds were released before judgment entered. In any event, the aggregate fees awarded to the plaintiffs fall well short of $7 million (the amount at which their claims could begin to encroach on the amounts Melita and Athena claim under the allocation agreement).

[17]The defendants argue on appeal that the attorney lien statute, G. L. c. 221, § 50, limits an attorney's recovery thereunder to the share of the fund that the client has recovered. The argument is moot, for the reasons cited in the preceding footnote. In any event, the lien furnishes merely a basis to secure a claim, rather than the basis for the claim itself. With or without a lien, the attorneys were entitled to claim and recover the amounts due to them for their respective services.

[18]The defendants' assertions on appeal that all parties had understood from the outset of the case that the jury would be asked to determine the defendants' respective shares of the settlement proceeds stands in contrast to their repeated insistence prior to trial, and during its early stages, that the allocation of proceeds among the Picciotto parties was not a question for the jury at all, as it was determined by the allocation agreement.

There is likewise no merit to Athena's separate claim that the judge had a

The judge likewise did not abuse his considerable discretion in excluding the allocation agreement from evidence. "Whether evidence is relevant is a question 'addressed to the sound discretion of the trial judge.' " *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 477 (1991), quoting from *Commonwealth* v. *Booker*, 386 Mass. 466, 469 (1982). It is "within the judge's discretion to decide whether the probative value of the evidence outweighs the possibility that it would mislead or prejudice the jury." *Kobico, Inc.* v. *Pipe*, 44 Mass. App. Ct. 103, 109 (1997). "We will not reverse such decisions unless there is palpable error." *Carrel* v. *National Cord & Braid Corp.*, 447 Mass. 431, 446 (2006).

The allocation agreement was entered into among related parties, at a time when they anticipated the attorneys' assertion of claims against Stefano, Judith, and FCC for unpaid legal fees. Moreover, the judge was aware of notes written by Casher during the course of settlement negotiations that suggested that the allocation was made in part in an attempt to "minimize exposure to attorney's fees."[19] Viewed together with evidence that the attorneys who had been engaged to file claims on Melita's and Athena's behalf had been unable to substantiate their injuries, we consider the judge to have acted within his discretion in concluding that the allocation agreement could have tended to mislead rather than illuminate the jury as to the value of Melita's and Athena's claims and their respective shares of the settlement proceeds.

To say that the pleadings did not raise the issue of the allocation of settlement proceeds among the defendants, and that the allocation agreement was properly excluded from evidence, is not to say that the value of Melita's and Athena's claims were entirely irrelevant to the issues in the trial, however. Several of the plaintiffs sought fees in quantum meruit, arising out of terminated

---

heightened duty to protect her interests, as she was a minor child. Whatever the judge's duties toward her may have been, they did not extend to examining the pleadings filed on her behalf to ensure their adequacy to raise all claims she might potentially wish to assert. Moreover, as we have noted (see note 16, *supra*), the amounts actually awarded to the plaintiffs render moot any claim that Athena was deprived of a property interest.

[19]The judge excluded Casher's notes from evidence as attorney work product. No party challenges that ruling in this appeal.

contingent fee agreements with Stefano and Judith, Juan Nunez, and FCC, but not with Melita and Athena.

The ability of an attorney to recover fees under a theory of quantum meruit arising out of a contingent fee agreement is settled. See *Liss* v. *Studeny*, 450 Mass. 473, 478 (2008), and cases cited. "Quantum meruit 'is a claim independent of an assertion for damages under the contract, although both claims have as a common basis the contract itself.' " *Id.* at 479, quoting from *J.A. Sullivan Corp.* v. *Commonwealth*, 397 Mass. 789, 793 (1986). Strictly speaking, the termination of the attorney's engagement ends the attorney's right to recover on the contingent fee agreement itself. See *Opert* v. *Mellios*, 415 Mass. 634, 636 (1993); *Salem Realty Co.* v. *Matera*, 10 Mass. App. Ct. 571, 575-576 (1980), *S.C.*, 384 Mass. 803 (1981). However, "[w]hile a party does not recover on the contract itself under quantum meruit, a court may look to the terms of the underlying contract to help determine appropriate recovery under quantum meruit." *Liss* v. *Studeny*, *supra* at 480. "Other factors to be considered are the customary ones applicable in measuring a legal fee: the special skills which may have been brought to bear, the complexity of the case, the size of the case in terms of dollars, the caliber of the services, the fees usually charged for work of the kind involved, the time spent, and the success achieved." *Salem Realty Co.* v. *Matera*, 10 Mass. App. Ct. at 576.

From what we have said, it may be seen that the value of Melita's and Athena's claims was of some potential relevance to the determination of the fees due in quantum meruit to the plaintiffs who had been engaged under a contingent fee agreement by the defendants other than Melita and Athena.[20] However, its relevance was at most indirect, and related to but one of the several

---

[20]Any amount of the settlement attributable to Melita's and Athena's claims would reduce the portion of the $9 million in total settlement proceeds attributable to the claims of the other defendants. In other words, the attribution of no value to the daughters' claims could result in the jury accepting an artificially inflated view of the amount recovered by the other defendants (if the daughters' claims instead had had substantial value). To the extent that the amount recovered by the other defendants was relevant to determination of the fees due from them under a theory of quantum meruit, the exclusion of evidence of the value of the daughters' claims could have distorted the jury's evaluation of the defendants' claims. The question accordingly is not (as the plaintiffs have framed it in their brief on appeal) whether the settlement

factors to be weighed by the jury under quantum meruit. Its proffer came late in the trial, and reflected a significant change in position by the Picciotto parties (who, as we have observed, formerly had insisted that the allocation agreement was determinative of the values of their separate portions of the settlement proceeds). If pursued, the development of the values of Melita's and Athena's claims by means of medical evidence was likely to consume significant amounts of time in relation to its relevance to the issues at trial. Cf. *Curtiss-Wright Corp.* v. *Edel-Brown Tool & Die Co.*, 381 Mass. 1, 8-9 (1980). It is not at all clear to us that the judge abused his discretion in excluding the evidence in the circumstances.[21]

Moreover, even were we to assume that exclusion of the evidence was error, we would conclude that the error was of little or no consequence to the jury's consideration of the various plaintiffs' claims, for the reasons that follow.

"If relevant evidence is erroneously excluded, 'the appropriate test [to determine if the exclusion created reversible error] is whether the proponent . . . has made a plausible showing that the trier of fact might have reached a different result if the evidence had been before it. Thus, the erroneous exclusion of relevant evidence is reversible error unless, on the record, the appellate court can say with substantial confidence that the error would not have made a material difference.' " *Foreign Car Center, Inc.* v. *Salem Suede, Inc.*, 40 Mass. App. Ct. 15, 17 (1996), quoting from *DeJesus* v. *Yogel*, 404 Mass. 44, 48-49 (1989). We consider the claims of each of the plaintiffs in relation to the extent to which each claim under quantum meruit could have been

proceeds are available on an undifferentiated basis to satisfy any amounts awarded on the plaintiffs' claims, but instead whether the jury had before them all evidence relevant to the determination of the result achieved by the attorneys on behalf of clients with whom they previously had contingent fee agreements.

[21]We note as well that in arguing for the admission of the evidence, Casher described Melita's and Athena's claims as claims for loss of consortium. However, no such claim had been asserted in any pleading they previously had filed, including the complaint Zabin filed in their behalf in 1994 and the proofs of claim Gilleran filed in their behalf in 1997. Nor did their answers or counterclaims in the present action (which the judge's procedural order directed be pleaded "with heightened particularity") assert any such claim. In excluding the evidence, the trial judge commented that its admission at that late stage of the trial would work an unfair surprise on the plaintiffs.

affected by evidence that the claims of Melita and Athena held substantial value.

a. *Attorney Greer.* Greer's complaint sought recovery of fees for his services to Juan Nunez in the 1983 Salem Suede litigation, and to Stefano and Judith and FCC in the BayBank litigation (as to the latter, see note 9, *supra*). Greer did not represent Melita or Athena. Though Greer was engaged on a contingent fee basis, he based his fee claim in quantum meruit on the time he spent, rather than a percentage of the recovery. He did not keep contemporaneous time records during his representation, but testified that he had reconstructed his records to conclude that he had spent 800 hours on his representation. He also testified that his hourly rate was $250 per hour. The jury awarded him $180,000, plus expenses, essentially accepting his request for 800 hours at $250 per hour. His award accordingly is unaffected by any amount of the settlement attributable to the claims of Melita and Athena.[22]

b. *Attorney Eigerman.* Eigerman represented Stefano, Judith, and FCC in the BayBank litigation, and represented the same parties, with the addition of Juan Nunez, in the Salem Suede litigation. He testified that Stefano and Nunez agreed to pay him at his usual hourly rate ($225 per hour) out of their ultimate recovery. When he withdrew from his representation, he submitted bills totaling $96,078.04.[23] The jury awarded him a total of $93,678.56. Because his fee was based on an hourly rate and did not rest in any manner on a contingent fee arrangement, Eigerman's award is likewise unaffected by any amount of the settlement attributable to Melita's and Athena's claims.

c. *Attorney McCabe.* McCabe represented all of the defendants under a written fee agreement (at twice his usual hourly rate). He sought recovery of $137,000 from the Picciottos and $79,786 from Nunez. The jury awarded him $68,507 from the

---

[22]The jury verdict does not appear to award Greer any amount for his representation of Nunez in the Salem Suede litigation. He testified that he and Zabin agreed that they would share the fee earned by Zabin in that case. In his closing, Zabin's attorney stated that Zabin would pay Greer from the amount awarded to Zabin.

[23]He did not submit periodic bills during the course of his representation, because his arrangement did not contemplate payment until his clients achieved a recovery.

Picciottos and $44,630 from Nunez (appearing, in essence, to reject his request for compensation at twice his usual hourly rate). Because his fee was based on an hourly rate rather than a contingent fee, and because he represented all of the defendants, including Melita and Athena, his award is unaffected by any amount of the settlement proceeds attributable to the daughters' claims.

d. *Attorney Zabin.* Zabin represented Melita and Athena only briefly, and withdrew from that representation upon his inability to satisfy himself that they had any grounds for a claim. Zabin represented the other defendants under a contingent fee arrangement calling for forty percent of the recovery. At trial, Zabin's expert, attorney Camille Sarrouf, testified that Zabin was entitled to receive forty percent of $2.2 million (the highest offer he received in settlement negotiations), plus expenses. That settlement offer did not encompass Melita's and Athena's claims, and cannot be said to include any amount attributable to them. The expert further testified that Zabin's success was the foundation of the ultimate settlement, and that his efforts following completion of the Salem Suede trial contributed to the ultimate result. In his summation, Zabin's attorney argued to the jury that they should award him forty percent of $2.2 million, plus "an award that you feel is fair and reasonable for the work he did" for the three years after the trial that contributed to the ultimate settlement. The jury awarded Zabin $1,010,000, plus expenses. Accordingly, to the extent the jury awarded Zabin any amount deriving from the amount by which the ultimate $9 million settlement exceeded the $2.2 million offer he received, the basis upon which any additional amount rested was insubstantial in relation to the full settlement amount.[24] We conclude that the jury did not base their award to Zabin on an artificially inflated view of the amount of the recovery attributable to his clients' claims.

e. *Attorney Gilleran.* Gilleran represented Nunez, Stefano and Judith, and FCC under a contingent fee agreement, and represented Melita and Athena on an hourly rate basis. He sought a contingent fee based on the entire $9 million settlement, plus

[24]The amount of the jury award ($1,010,000) is forty percent of $2,525,000. Accordingly, the jury appears to have attributed to Zabin's posttrial efforts only $325,000 of the $6.8 million by which the ultimate settlement exceeded the highest offer Zabin had obtained.

an hourly fee for his services on behalf of Melita and Athena. At trial, Gilleran's expert gave his opinion regarding the proper methodology for determining the fee due to Gilleran in quantum meruit, and Gilleran's trial attorney reminded the jury of that methodology, in detail, in his brief closing argument. According to the expert, the jury should begin with the full settlement amount ($9 million), deduct the value of the judgment (with interest) as of the time Gilleran commenced his engagement ($2,327,249), and multiply the resulting figure by thirty-five percent (the contingent fee percentage established under Gilleran's contingent fee agreement). From the resulting $2,334,762, the jury should then subtract the amounts awarded to McCabe and Eigerman, and the amount paid to Casher ($231,000).[25] The result of that calculation produced a fee for Gilleran in the amount of $1,858,809, according to the expert. That amount, however, far exceeds $1,052,000, the amount the jury actually awarded to Gilleran. More significantly, the amount of the jury's actual award to Gilleran is lower than the amount the jury would have awarded Gilleran, pursuant to the same formula, had it excluded $2 million (the amount claimed by Melita and Athena under the allocation agreement) from the $9 million settlement proceeds. Viewing the evidence as a whole, we are not persuaded that the trier of fact might have reached a different result as to Gilleran had the evidence been admitted. See *DeJesus* v. *Yogel,* 404 Mass. at 47-49.

4. *Prejudgment interest.* Upon entry of the judgment, the trial judge awarded the plaintiffs statutory interest under G. L. c. 231, § 6C, commencing as of April 7, 1999, the date on which Travelers filed its interpleader complaint. On appeal, the defendants contend that no prejudgment interest should have been awarded.[26]

Payment of interest on an award for breach of contract is governed by G. L. c. 231, § 6C. As we have discussed, the claims of the plaintiffs sound in contract, though the determina-

[25]Under the suggested formula, Zabin's fee was to be recovered from the underlying award in the Salem Suede litigation. Greer's fee for his involvement in the Salem Suede litigation was to come out of Zabin's share. See note 22, *supra.*

[26]The defendants' separate contention that postjudgment interest should not have accrued, because no final judgment entered, is disposed of by our conclusion, *supra,* that final judgment did enter.

tion of their entitlements was based on principles of quantum meruit. The applicability of the statute to claims for attorney's fees based in quantum meruit is established. See *Abrams* v. *Loew*, 335 Mass. 96, 100 (1956); *Salem Realty Co.* v. *Matera*, 10 Mass. App. Ct. at 577-578. Pursuant to the statute, interest runs from the date of breach or demand. In a case (such as the present case) in which the date of breach or demand is not determined by the jury, the statute provides that interest shall run from the date on which suit is commenced.[27] See *Deerskin Trading Post, Inc.* v. *Spencer Press, Inc.*, 398 Mass. 118, 125 (1986).

The defendants contend that interest should not run in the present case because it initiated as an interpleader action, rather than as a conventional action for breach of contract. The argument is misplaced for several reasons. First, the deposit of funds into court typically relieves only the depositor from the accrual of interest after such deposit, and then typically only where the depositor disclaims all further right to the deposited funds. See *Tarpey* v. *Crescent Ridge Dairy, Inc.*, 47 Mass. App. Ct. 380, 393 (1999). More fundamentally, the trial judge dismissed Travelers at a very early stage of the proceedings, and thereafter, pursuant to the judge's procedural order of realignment of the parties, the case was repleaded as an action by the plaintiffs for breach of contract (and related claims), with counterclaims filed by the defendants with their answers. The amended pleadings superseded the initial interpleader complaint in form and in substance. Thereafter, the funds held by the court stood as security for the plaintiffs' claims and were released by the judge at various intervals upon a showing that the amount to be released was unnecessary as security for the amounts claimed.[28]

The defendants' argument that interest should not run because

---

[27]The defendants' reliance on *Craft* v. *Kane*, 65 Mass. App. Ct. 322 (2005), for the contrary proposition is unavailing. In that case, which presented "a unique set of circumstances," *id.* at 327, an attorney sought to enforce a lien for payment of services by means of a motion brought in the underlying suit, rather than (as in the present case) by an action for breach of contract. *Id.* at 323. In any event, to the extent that *Craft* may be read to suggest that interest cannot run on a claim under quantum meruit until the value of the services is determined, it is inconsistent with *Salem Realty Co.*, *supra*, and *Abrams*, *supra*, and we decline to follow the suggestion.

[28]Had the plaintiffs initiated suit on their claims by means of a complaint for breach of contract, and sought prejudgment security by means of attach-

they did not have use of the funds during the pendency of the proceedings is inapposite. The award of interest compensates the prevailing party for the loss of use of funds, without regard to any use made by the adverse party (or whether funds were held in escrow). See *Conway* v. *Electro Switch Corp.*, 402 Mass. 385, 390 (1988); *Smith* v. *Consalvo*, 37 Mass. App. Ct. 192, 194 n.3, 199 (1994). In any event, though the defendants did not have actual use of the funds while they were on deposit with the court, the funds were invested in interest-bearing instruments, and the earned interest operated to defray (at least to some extent) the accrual of interest under G. L. c. 231, § 6C.[29]

5. *Deposition of Attorney Casher.* The defendants contend that the trial judge erred in allowing the plaintiffs to take the deposition of Casher, the defendants' trial counsel, and that the error was compounded by allowing the deposition to be introduced in evidence at trial. We disagree.

Central to the issues in dispute in the present case were (1) what services each plaintiff furnished on behalf of the defendants during the period of engagement, (2) how those services contributed to the settlement with Travelers, and (3) whether any of the plaintiffs committed malpractice in the course of providing those services. Among other allegations, the defendants contended that the plaintiffs contributed little toward the achievement of the Travelers settlement, and that the settlement accordingly was attributable largely to the services Casher furnished following termination of the plaintiffs' respective engagements. Though the parties have cited no Massachusetts precedent directly on point, we agree with the cases from other jurisdictions relied upon by the trial judge holding that in cases (such as the present case) in which a client sues a former attorney for malpractice, the attorney-client privilege is waived as to communications with all attorneys involved in the underlying litigation in

ment or a bill to reach and apply, there is no question that they would be entitled to interest on any award beginning on the date of their complaint. See *DiMarzo* v. *American Mut. Ins. Co.*, 389 Mass. 85, 107 (1983). We see no reason why a different result should obtain merely because Travelers precipitated the present action by its complaint for interpleader.

[29]It is of no consequence for purposes of the statute that the rate of interest imposed under G. L. c. 231, § 6C, was higher than the rate actually earned by the funds in conventional investment instruments.

which the malpractice allegedly occurred. See *Bieter Co.* v. *Blomquist,* 156 F.R.D. 173, 176-179 (D. Minn. 1994); *Rutgard* v. *Haynes,* 185 F.R.D. 596, 597-600 (S.D. Cal. 1999); *Pappas* v. *Holloway,* 114 Wash. 2d 198, 202-209 (1990). See also *Hearn* v. *Rhay,* 68 F.R.D. 574, 580-582 (E.D. Wash. 1975); *Handgards, Inc.* v. *Johnson & Johnson,* 413 F. Supp. 926, 929 (N.D. Cal. 1976). The nature of the defendants' allegations placed the work Casher performed in the underlying litigation directly at issue, and Casher was the only source available to testify regarding the work she performed. The trial judge imposed an appropriate protective order on the scope of the deposition, directing that it could not extend to any communications between Casher (or her law firm) and the defendants relating to the preparation and conduct of the present case. There was no error in the denial of Casher's motion to quash the deposition subpoena.

Prior to trial, the judge allowed the motion of the plaintiffs to offer in evidence portions of the transcript of Casher's deposition testimony. We review the decision of a trial judge to allow use of a deposition at trial for abuse of discretion. See, e.g., *Allgeier* v. *United States,* 909 F.2d 869, 876 (6th Cir. 1990) (interpreting standard of review under identical Federal rule). We discern no abuse of discretion in the present case, if for no other reason than that (as observed by the trial judge) use of the deposition avoided the undesirable result of requiring Casher to testify at a jury trial in which she also appeared as an advocate.

There is no merit to the defendants' protest that Casher was not represented by counsel at her deposition. The judge's order denying her motion to quash the deposition specifically directed that she should be represented by counsel, and the choice (whether by the defendants or Casher herself) to eschew such representation cannot be cause for them to object to the resulting deposition (or its use). There is similarly no basis for objection in the fact that Casher was not subject to cross-examination at her deposition. To the extent the absence of cross-examination was a result of the absence of an attorney representing her at the deposition, it was, as we have noted, the result of choice. Moreover, had the defendants wished to supplement the deposition with cross-examination for purposes of its use at trial, they could have sought leave to resume the deposition upon entry of the judge's pretrial order authorizing use of the deposition at

trial.[30] The record reveals no such request.[31] Finally, the Picciottos were allowed to offer, as rebuttal, other portions of Casher's deposition transcript in evidence.

6. *Dismissal of claims based on Stefano's medical records.* During discovery, the plaintiffs learned that Stefano had applied for, and obtained, disability benefits from the Social Security Administration based on the adverse health effects he suffered as a result of the Salem Suede emissions. Counsel for one of the plaintiffs requested that Stefano execute a consent form for the release of the medical records submitted in support of that application. Stefano's counsel responded that the records were "not relevant," and the plaintiffs sought, and obtained, an order directing the Social Security Administration to produce the records. After the Social Security Administration refused to produce the records without Stefano's consent, the plaintiffs sought, and obtained, an order directing Stefano to execute such a consent within thirty days.[32] Stefano's interlocutory appeal from that discovery order was unsuccessful, but he nonetheless refused to comply with it. Following a hearing at which Stefano was given one last opportunity to comply with the order, the judge dismissed Stefano's counterclaims for emotional distress, and barred him from asserting claims relative to his physical and mental injuries. On Melita's subsequent request for clarification, the judge thereafter ruled that the other Picciotto family members could not assert claims for loss of consortium based on the injuries to Stefano.

The judge was clearly within his discretion in ordering Stefano to consent to the release of the requested documents. Discovery is permitted as to "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Cronin* v. *Strayer*, 392 Mass.

[30]The judge's written order is dated August 2, 2001; trial began on September 20, 2001.

[31]The solution the defendants proposed during trial (to have Melita conduct a pro se cross-examination of Casher through live testimony at trial) would, among other infirmities, have created the very situation (trial counsel acting as both advocate and witness before the jury) that the use of the transcript was designed to avoid. The judge committed no abuse of discretion in denying that tactic.

[32]The order advised that, unless Stefano complied with the order, certain of his counterclaims would be dismissed.

525, 534 (1984), quoting from *Oppenheimer Fund, Inc.* v. *Sanders*, 437 U.S. 340, 351 (1978). The records were clearly relevant to Stefano's condition and reasonably could be expected to include the evaluation of his condition by independent medical professionals within the Social Security Administration. Stefano was given fair warning of the consequences that would follow his continued defiance of the judge's order, and the judge acted within his discretion in imposing the threatened sanction.[33] See *Roxse Homes Ltd. Partnership* v. *Roxse Homes, Inc.*, 399 Mass. 401, 404-406 (1987).

Nor do we discern any prejudice in the imposition of the sanction on the other Picciotto family members. To the extent any such evidence was potentially relevant to establish the separate values of Melita's and Athena's claims, it worked no prejudice for the reasons described in our discussion of the allocation agreement above. In any event, as we have observed (see note 21, *supra*), neither daughter ever asserted any claim for loss of consortium in any pleading in any proceeding (including the present action). As for Judith, her claims against the plaintiffs sought damages for intentional infliction of emotional distress and similarly did not assert any claim that their actions caused loss of consortium based on injuries suffered by Stefano.

7. *Evidentiary rulings.* The defendants claim error in several rulings by the trial judge to exclude evidence, which we address below.

---

[33]The defendants contend that the sanction of dismissal was extreme and unwarranted, asserting that they offered to produce all documents other than those relating to payments of public assistance. To the contrary, the judge specifically noted in his order of dismissal that he had, on February 2, 2001, requested Stefano's counsel "to identify those documents or categories of documents which he did not want disclosed by the Social Security Administration [but that] [n]either Stefano nor his counsel specified documents or categories of documents entitled to special protection." Again, in rejecting Melita's emergency motion for reconsideration, the judge specifically noted that "at *no* time during the pendency of the effort of the lienholder attorneys . . . to achieve production of Mr. Picciotto's Social Security records did he offer to provide those health or medical records upon condition of the protection of his Social Security Welfare benefit records. Stefano offered no compromise solution and simply refused to obey the pertinent court orders." No contemporaneous challenge to those statements appears in the record. Casher's affidavit asserting otherwise, filed more than four months following the return of the adverse jury verdict and more than a year after the judge's order, is without corroboration in the record.

a. *Evidence of defendants' own efforts toward settlement.* The defendants sought to introduce evidence of efforts they made to prompt Travelers to settle with them, for the purpose of demonstrating that the efforts of the plaintiffs were not as instrumental to producing the settlement as the plaintiffs claimed. In particular, the defendants cite a petition Melita filed with the Supreme Judicial Court in December, 1998, seeking review of Travelers's license to issue insurance based upon its allegedly improper conduct. Noting the close temporal proximity between the filing of the petition and the settlement with Travelers in January, 1999, the defendants sought to introduce the petition to support the contention that it contributed to Travelers's agreement to settle with them. We discern no abuse of discretion in the trial judge's ruling that absent supporting testimony by Travelers, any inference that Melita's petition contributed to the settlement is speculative.[34]

b. *Letter of January 7, 1998, from Judith to Gilleran.* Early in the trial, the judge issued an order in response to several attempts by the defendants to submit in evidence letters containing hearsay, arguments, conclusions, and accusations. In his order, the judge observed that such letters typically included a great deal of inadmissible material accompanying any admissible material, and he directed counsel to redact inadmissible portions of such letters before offering them in evidence. During cross-examination of Gilleran, the judge excluded a letter from Judith to Gilleran dated January 7, 1999. There is no indication in the record that counsel complied with the judge's earlier order to redact inadmissible material before offering the letter in evidence. For that reason alone the exclusion of the letter was justified.[35]

[34] The defendants also assert that, through their own independent efforts, they discovered damaging internal Travelers's loss manuals which contributed to Travelers's decision to settle. Similarly, they assert that they uncovered evidence of fraud in Salem Suede's bankruptcy proceeding. In both cases, they claim, the judge improperly excluded the evidence. However, they have furnished no citation to any such order or ruling, or to any offer of proof, in the record. Without support in the record, they cannot establish error or prejudice.

[35] The letter contained numerous assertions by Judith that Gilleran's performance was substandard, and it was offered for the purpose of establishing that proposition (in order to establish that Gilleran did not have good cause to withdraw as counsel). The unredacted hearsay was inadmissible, as it would have "permitted [Judith] to corroborate [her] own testimony and bolster

Moreover, the judge allowed the defendants' counsel to cross-examine Gilleran regarding the contents of the letter.

c. *Evidence of attorney's fee demands between the Travelers settlement and interpleader complaint.* The trial judge sustained objections to the defendants' attempts to elicit, from Zabin, testimony concerning his efforts to secure payment of his fee (by filing liens in the Bankruptcy Court and opposing, in Superior Court filings, distributions of proceeds by the court to the defendants). The defendants contend the judge's ruling was error, as the evidence was relevant to their claims of negligence by the plaintiffs and of the plaintiffs' unfair and deceptive practices, and in defense of the plaintiffs' claims of unfair trade practices against them. There was no error.

Zabin's attempts to secure payment of his fee (following conclusion of his engagement) is wholly separate and distinct from the question of his negligence or proficiency in the representation from which the fees derived, and is irrelevant to the defendants' claims of malpractice. Moreover, under G. L. c. 221, § 50, an attorney's lien attaches to the full amount of a settlement or judgment, until determination of the amount due to the attorney. The defendants cite no authority for their contention that Zabin's efforts to secure payment of his fee constitutes an unfair or deceptive act or practice.

The defendants cite no other instance in the record in which the judge excluded evidence of the plaintiffs' pretrial demands for payment. Though Casher asserted in an affidavit filed several months following the jury's verdict (see note 33, *supra*) that, if allowed, she would have offered deposition testimony, answers to interrogatories, and other documents to support the defendants' claim that the plaintiffs made unreasonable demands, the defendants have furnished no citation to the record (and our review of the record has revealed no instance) showing any attempt to offer any such materials in evidence, any offer of proof, or any orders or rulings excluding them.[36]

d. *Expert testimony of Herbert Weissblum.* In their brief, the

_____

[her] own credibility." *Commonwealth* v. *Mazzone*, 55 Mass. App. Ct. 345, 348 (2002), quoting from *Commonwealth* v. *Quincy Q.*, 434 Mass. 859, 869 (2001).

[36]During her opening statement, Casher asserted that the plaintiffs had

defendants Stefano and Judith assert that the trial judge erred in precluding one of their expert witnesses, attorney Herbert Weissblum, from "offering opinions as to the actions taken by attorney Zabin." They do not specify any ruling in particular to which their claim of error relates.[37] Furthermore, Weissblum testified at length on a variety of subjects at trial. The defendants have made no showing of error.[38]

e. *Testimony of Zabin.* The judge denied the plaintiffs' motion in limine insofar as it sought to preclude Weissblum from testifying that Zabin was negligent in agreeing to the dismissal of the defendants' claims against Salem Suede under G. L. c. 93A,

---

sought fees which, in aggregate, exceeded the full $9 million settlement proceeds. Upon objection by the plaintiffs, the judge administered an instruction to the jury that based on the pleadings filed with the court, the plaintiffs were not seeking the full $9 million proceeds, and further informed the jury that $3 million had (to that point) been released to the defendants. The judge further instructed the jury to keep an open mind about how much the plaintiffs were seeking and to base their determination of that question on the evidence presented at trial on that issue. The judge expressly stated to Casher that his ruling on the plaintiffs' objection to her opening statement did not preclude her from introducing evidence at trial to show that the aggregate amount of the plaintiffs' claims could exceed $9 million and, based on such evidence, to return to such an argument later in the trial.

[37]The record citation accompanying the argument is to the affidavit (with exhibits) of Stefano in support of the defendants' motion for correction or modification of the record. The affidavit and exhibits encompass 255 pages, and cover a variety of subjects. One of the exhibits to the affidavit is an affidavit of Weissblum, apparently filed in support of the opposition to a motion in limine filed by the plaintiffs. In it, Weissblum expresses his opinion that Zabin's agreement to the dismissal of the defendants' claims against Salem Suede under G. L. c. 93A was negligent and caused substantial harm to his clients. We assume that Weissblum's affidavit is the reference intended by the record citation. However, though the affidavit describes a portion of the testimony Weissblum proposed to furnish, that description does not correspond to the description of the testimony Stefano's brief describes as having been excluded. Moreover, Weissblum was allowed to testify at trial regarding the subjects described in his affidavit.

[38]We note that, in a lengthy written order on the plaintiffs' motion in limine, the judge barred testimony of the defendants' experts as to certain subjects, based on inadequate responses to expert interrogatories. Though the plaintiffs' motion was denied as to most of the subjects to be covered by Weissblum's anticipated testimony, it was allowed in certain respects. However, on appeal the defendants merely argue that the limitation of Weissblum's testimony caused them prejudice. They do not contend that his answers to interrogatories on the excluded subjects were in fact adequate or that the judge's ruling was incorrect.

based on his conclusion that there was legal support for the expert's opinion. Based on that ruling, the defendants contend that it was error for the judge to allow Zabin to offer, through his own testimony, his contrary opinion that the defendants' claims against Salem Suede under c. 93A were without merit (and, therefore, that he was justified in agreeing to the dismissal of such claims). The defendants' contention is unavailing. In his ruling on the motion in limine, the judge expressed his view that the question was close. In an action for malpractice, the law does not require an attorney to be perfect or infallible in assessing the likelihood of success for a particular claim. See *Coastal Orthopaedic Inst., P.C.* v. *Bongiorno*, 61 Mass. App. Ct. 55, 58-59 (2004). "As a predicate to rendering such litigation opinions, the legal engagement by the attorney involves the undertaking of a comprehensive review of the case facts and an analysis of applicable law, in which endeavors the attorney must 'act[] with a proper degree of attention, with reasonable care, and to the best of his skill and knowledge.' " *Ibid.*, quoting from *Colucci* v. *Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C.*, 25 Mass. App. Ct. 107, 111 (1987). Even if his assessment was ultimately incorrect, which we need not decide, Zabin's thought process at the time of his advice was relevant and material to the negligence claim against him, as were the grounds for his conclusion. Moreover, his testimony was subject to cross-examination. There was no error.

8. *Due process.* The defendants claim a number of errors that they contend deprived them of due process. Upon close examination of the record, we conclude that the claimed errors, viewed individually or collectively, do not require a new trial.

a. The defendants claim that the absence from the court room of an American flag, required by G. L. c. 220, § 1, warranted a mistrial. Our review of the transcript reveals that counsel made no objection to proceeding without the presence of an American flag.[39] When the issue was raised by Melita at the outset of her testimony, the record indicates that the flag had been borrowed

---

[39]Though the defendants cited the absence of an American flag, among other alleged errors, as a ground for a mistrial in a motion filed near the end of the trial, there was no objection to the absence of the flag before Melita's observation at the outset of her testimony. As we observe, the deficiency was promptly remedied thereafter.

by another court, and was returned to the court room before the morning session was over. Moreover, there is no suggestion in c. 220, § 1, that the absence of an American flag from the court room requires a new trial.[40]

b. Melita claims that the judge's denial of her pretrial request to proceed pro se forced her to receive the assistance of ineffective counsel.[41] We recognize that "[a]s a general proposition, individuals may prosecute or defend their own action. G. L. c. 221, § 48." *LoCicero* v. *Hartford Ins. Group*, 25 Mass. App. Ct. 339, 344 (1988). "When litigation is actively before the court, however, the grant or denial of a lawyer's motion to withdraw in a civil case reposes in the discretion of the motion judge." *Ibid.* Judges may consider the timeliness of the motion, the effect upon the reasonable expectation of the opposing party to have a case efficiently adjudicated, and the imposition on the court. *Ibid.*

In denying Melita's request, the judge observed that Casher had been serving as Melita's counsel since commencement of the action, was well familiar with its intricacies, and would continue to serve as counsel to the other defendants. In addition, Melita had engaged in disruptive behavior during a number of pretrial proceedings, including pacing back and forth within the bar enclosure; delivering prolonged monologues; shouting; refusing instruction to sit down, stop talking, and allow the proceedings to continue; and directing offensive personal remarks toward other parties and the judge. The judge at one point issued an order forbidding Melita from engaging in further misconduct and instructing her that further disruptions would have adverse consequences, including a finding of contempt and imposition of contempt sanctions. The disruptive potential of such behavior was magnified in the circumstances of this case, which involved multiple parties and issues, and which clearly would require an extended trial even in the hands of experienced counsel for all parties. We discern no abuse of discretion in the judge's refusal to allow Melita to proceed pro se.

c. Citing Supreme Judicial Court Rule 1:19 (2000), the

---

[40]The defendants cite no prejudice flowing from the claimed error.

[41]We note that nothing in the judge's order precluded Melita from engaging other counsel.

defendants claim it was error to deny their motion to allow them to videotape the proceedings. To the contrary, though rule 1:19 permits electronic recordings of proceedings open to the public by the news media for news gathering purposes and dissemination, it does not require judges to allow parties to videotape proceedings. The defendants make no reasoned legal argument that their request falls within the purview of rule 1:19, or that some other legal rationale demonstrates that the judge abused his discretion by denying their request for a videographer.

d. The defendants contend that the judge met, outside the court room, with a partner of one of the attorneys representing the plaintiffs, for the purpose of discussing the possibility of the judge becoming a trustee of the board of alumni at the law school from which both had graduated. There is no allegation that the instant litigation was mentioned during the meeting. Even accepting the allegation as true, there is no suggestion in the record that the judge pursued the possibility, or that any feature of the encounter raises a question of the judge's impartiality. See *Demoulas* v. *Demoulas Super Mkts., Inc.*, 428 Mass. 543, 551-552 (1998). We discern no due process violation.

e. As the trial approached the end of October, the jurors asked the judge if he would allow them to wear costumes on Halloween. After consulting with counsel for all parties and hearing no objection, the judge allowed the request. The defendants contend that the presence of jurors in costumes turned the trial into a circus and denied their rights to due process.[42]

With or without the consent of counsel to the parties, it is regrettable that the trial judge agreed to the jurors' request. The introduction of Halloween costumes cannot but have detracted from the seriousness and gravity of formal court proceedings. However, as to the defendants' claim of a due process violation, the judge did not merely accommodate the jurors' request; he consulted with counsel for all parties before doing so, and all counsel agreed. The issue is waived.

---

[42]The defendants also assert that some of the plaintiffs' counsel handed out candy to the jurors. They further claim that, on another occasion, a proposed "cast list" was circulated for a Hollywood movie version of the trial. The record reveals no objection to counsel to any party handing out candy to the jurors or any indication that the "cast list" was circulated to the jury.

f. Finally, the defendants argue that a new trial is required because the judge spoke to the press about the case while this appeal was pending, in violation of the Massachusetts Code of Judicial Conduct, S.J.C. Rule 3:09. The newspaper report evidencing this alleged violation properly was struck from the record. In addition to its status as hearsay, the judge's conduct after the termination of the trial is irrelevant to any claim of error in the conduct of the trial itself, or to any of the issues on appeal.

9. *Dismissal of counterclaims against Attorney Greer.* The defendants claim error in the dismissal of their counterclaims against Greer for abuse of process and violation of G. L. c. 93A. Both claims, they contend, are supported by his improper assertion of a lien against the settlement proceeds to secure his claim for fees. The defendants maintain that because his representation was limited to the BayBank litigation, his lien against the Travelers settlement proceeds was improper.

The argument is flawed on at least two levels. First, Greer entered an appearance in the 1983 Salem Suede litigation on behalf of Nunez, and had a fee agreement with Zabin for a percentage of Nunez's recovery. Moreover, the Travelers settlement encompassed all claims against Alan Zion (see notes 8 and 9, *supra*). Zion was a party defendant in the BayBank litigation, and the appeal of the judgment in that case was pending at the time of the Travelers settlement.[43]

The defendants also argue that the fee awarded to Greer should be vacated, because his representation of them in the BayBank litigation was under a contingent fee agreement and the contingency did not occur. See *Liss* v. *Studeny*, 450 Mass. at 481 ("As a general rule, the court will not grant quantum meruit recovery arising from a contingent fee contract where the contingency has not occurred").[44]

In *Liss*, the court recognized that exceptions to the general rule may be appropriate in certain "particularly compelling

---

[43]The judgment was affirmed on March 25, 1999. See *Picciotto* v. *Bay-Bank*, 46 Mass. App. Ct. 1119 (1999).

[44]*Liss* v. *Studeny*, *supra*, was decided after briefing concluded in the present case, and neither party has addressed it in their otherwise voluminous post briefing submissions.

situations." *Ibid.* For example, quantum meruit may be appropriate where the claimant's reasonable expectations are defeated by the actions or conduct of the party against whom a fee is claimed. *Ibid.*, citing *Salamon* v. *Terra*, 394 Mass. 857, 859 (1985). See *Girouard* v. *Jasper*, 219 Mass. 318, 321 (1914) (contractor induced by fraud may recover for value of labor and materials).

In the present case, Greer testified that Stefano told him that a "confidential informant" had observed Alan Zion influencing BayBank to "make things difficult" for Stefano at BayBank. Relying on that representation, Greer agreed to represent FCC and Stefano and Judith on a contingent fee basis, and he filed an action against BayBank and Zion, alleging that they had engaged in a conspiracy.[45]

On conflicting evidence, the jury concluded that Stefano had misled Greer about the strength of his claims against BayBank and Zion in order to induce Greer to undertake representation of him on a contingent fee basis. That conclusion justifies the jury's award of damages in quantum meruit, and it is not our province to disturb the jury's conclusion in such circumstances. See *Coady* v. *Wellfleet Marine Corp.*, 62 Mass. App. Ct. 237, 247-248 (2004).

10. *Claims under G. L. c. 93A.* Having reserved the parties' respective claims under G. L. c. 93A, the trial judge entered findings of fact and rulings of law, ultimately concluding that no party was entitled to recover under c. 93A. As to the defendants' claims against the plaintiffs, the judge found that the plaintiffs' actions did not constitute unfair or deceptive acts or practices.[46] As to the plaintiffs' claims against FCC, the judge found that FCC had engaged in unfair and deceptive acts or

[45]During the course of his representation, Greer sought and obtained an injunction against BayBank's threatened foreclosure of the Picciottos' residence (which had been mortgaged as collateral to secure a loan to FCC). As a result, the foreclosure of the Picciottos' home was delayed from approximately the time of Greer's engagement in 1994 through the appeal of the judgment in the BayBank litigation. Ultimately, proceeds from the Travelers settlement were released and applied to satisfy the BayBank claim and avoid foreclosure. See note 9, *supra*.

[46]Other than their challenges to certain evidentiary rulings with potential bearing on their c. 93A claims, discussed *supra*, the defendants assert no challenge on appeal to the judge's rulings on their c. 93A claims themselves.

practices, but that an attorney cannot recover against a former client under c. 93A for actions arising out of the former attorney-client relationship. Eigerman has appealed from the latter ruling, as to his claim.[47] We affirm the dismissal of Eigerman's claim, though we do so on grounds other than those relied upon by the trial judge.

Eigerman asserted his claim against FCC under G. L. c. 93A, §§ 2 and 11, based on its failure to pay him for legal services rendered to it.[48] A breach of contract, standing alone, is not an unfair trade practice under c. 93A. See *Whitinsville Plaza, Inc.* v. *Kotseas*, 378 Mass. 85, 100-101 (1979). Instead, to rise to the level of a c. 93A violation, a breach must be both knowing and intended to secure "unbargained-for benefits" to the detriment of the other party. *NASCO, Inc.* v. *Public Storage, Inc.*, 29 F.3d 28, 34 (1st Cir. 1994). The breaching party's conduct must exceed the level of mere self-interest, see *Atkinson* v. *Rosenthal*, 33 Mass. App. Ct. 219, 225-226 (1992), rising instead "to the level of 'commercial extortion' or a similar degree of culpable conduct." *Commercial Union Ins. Co.* v. *Seven Provinces Ins. Co., Ltd.*, 217 F.3d 33, 40 (1st Cir. 2000), cert. denied, 531 U.S. 1146 (2001), quoting from *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. at 474.

Specifically, a party's refusal to make payments due under a contract does not constitute an unfair trade practice where the party, in good faith, disputes its obligation to make the payments. *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979). See *Striar* v. *American Med. Intl., Inc.*, 45 Mass. App. Ct. 87, 100-101 (1998) (failure to make payments not an unfair trade practice where breaching parties had genuine and substantial difference of opinion as to amounts due under contract); *Quaker State Oil Refining Corp.* v. *Garrity Oil Co.*, 884 F.2d 1510, 1513-1514 (1st Cir. 1989) (failure to make payments and

---

[47]The other plaintiffs assert no challenge to the ruling.

[48]In his memorandum of decision, the trial judge did not address whether Eigerman and FCC were engaged in trade or commerce, for purposes of G. L. c. 93A, § 11. For purposes of our analysis, we assume, without deciding, that the parties were engaged in trade or commerce, based on Eigerman's efforts on FCC's behalf to recover a money judgment owed to FCC and arising out of damages suffered, inter alia, for loss of business. See *Frullo* v. *Landenberger*, 61 Mass. App. Ct. 814, 821-822 (2004).

filing counterclaims not unfair trade practices where there was no indication that breaching party's actions were motivated by attempt to extort other party). Only when the breaching party uses its failure to make payments as a wedge against the other party to gain advantages does the breaching party's conduct rise to the level of an unfair trade practice under G. L. c. 93A. See *Community Builders, Inc.* v. *Indian Motocyle Assocs., Inc.*, 44 Mass. App. Ct. 537, 558-559 (1998) (failure to make payments was an unfair trade practice where breaching parties withheld payment to pressure the other party to compromise its claims for payment); *Pepsi-Cola Metropolitan Bottling Co.* v. *Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir. 1985) (failure to make payments was an unfair trade practice where breaching party withheld payment to enhance its bargaining power with the other party); *Arthur D. Little, Inc.* v. *Dooyang Corp.*, 147 F.3d 47, 55-56 (1st Cir. 1998) (failure to make payments was an unfair trade practice where breaching party withheld payment to force the other party to accept discounted settlement of its claims for payment).

Whether conduct is unfair or deceptive under G. L. c. 93A is a mixed question of law and fact. However, unlike some such questions, the fact can be separated from the law, and each subjected to a different standard of review. See *Schwanbeck* v. *Federal-Mogul Corp.*, 31 Mass. App. Ct. 390, 414 (1991), *S.C.*, 412 Mass. 703 (1992) ("Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, . . . the boundaries of what may qualify for consideration as a c. 93A violation is a question of law"). Thus, when reviewing a trial judge's conclusion that particular conduct was or was not unfair or deceptive, we review the judge's subsidiary findings of fact under the clearly erroneous standard, while reviewing de novo his ultimate conclusion of law. See *Diamond Crystal Brands, Inc.* v. *Backleaf, LLC*, 60 Mass. App. Ct. 502, 507-508 (2004). See also *R.W. Granger & Sons, Inc.* v. *J & S Insulation, Inc.*, 435 Mass. 66, 73 (2001).

In the present case, Eigerman did not have a written fee agreement. The trial judge found that FCC (together with Stefano and Judith) formed the understanding with Eigerman that the clients lacked the funds to pay Eigerman at the time of their engagement

of him, but that they would compensate him for the fair value of his services from the collection of damages from one or more of Zion, Salem Suede, or Travelers. The trial judge further found that FCC's refusal to pay Eigerman after the settlement with Travelers constituted an unreasonable and unfair tactic, and that its prosecution of a malpractice claim against him was unreasonable and unfair conduct. We consider the trial judge's conclusions that FCC's failure to pay, and its prosecution of a malpractice claim against Eigerman, constituted an unfair trade practice to be erroneous as matter of law.

The settlement agreement between the Picciottos (including FCC) and Travelers expressly conditioned the release of the settlement proceeds upon the resolution of any liens or claims against the proceeds. As a strictly technical matter, FCC did not obtain control of the settlement proceeds upon the conclusion of the settlement agreement with Travelers, so its failure to pay upon settlement cannot even be said to have been in breach of its agreement with Eigerman (which contemplated payment only upon receipt of funds). Nor can it fairly be said that FCC's lack of receipt was a problem of its own making; as we have discussed above, several of the plaintiffs sought fees in quantum meruit, based on terminated contingent fee agreements. The determination of the fees due in such circumstances is highly fact specific, based on a particularized weighing of multiple factors in an adjudication. Whether Eigerman's particular claim (based on his hourly rate) was susceptible of more straightforward determination is beside the point; unless and until the competing claims of the various attorney lienholders were determined, FCC did not have access to the settlement proceeds. Pending final judgment in the present litigation, FCC was not in breach of its arrangement with Eigerman, much less guilty of unfair or deceptive acts or practices by reason of its failure to pay him.

The judge's subsidiary findings of fact similarly furnish no support for a conclusion that the assertion of a malpractice claim against Eigerman constituted an unfair or deceptive practice; the mere fact that the claim was unsuccessful does not mean that it was unfair or deceptive. The judge entered no finding that the claim was frivolous or prosecuted in bad faith.[49]

---

[49]Because we conclude that the judge's subsidiary findings of fact do not

11. *Other issues.* We address briefly several claims by the defendants relating to the record and other actions by the single justice.

a. *Reconstruction of missing transcript.* During assembly of the record, the official court reporter submitted an affidavit to the court that she had misplaced her audiotapes for trial dates December 13 and 14, 2001. Pursuant to Mass.R.A.P. 8(c), as amended, 378 Mass. 932 (1979), the defendants submitted their proposed version of the missing testimony, but the trial judge rejected their submittal as distorted, argumentative, and self-serving. The trial judge reconstructed the missing testimony from his notes and, on July 20, 2006, ordered that his reconstruction would serve as the approved settlement of the testimony on the affected days. See Mass.R.A.P. 8(c). The defendants contend on appeal that the judge's reconstruction is incomplete and inaccurate. However, "[w]hen a dispute respecting the record is submitted to the . . . court, its determination is conclusive, absent a showing that the court has intentionally falsified the record." *Burda* v. *Spencer,* 28 Mass. App. Ct. 685, 689 (1990), quoting from *Letch* v. *Daniels,* 401 Mass. 65, 67-69 & n.3 (1987).[50]

b. *Modification of the record.* Following assembly of the record and entry of the appeal on the docket of this court, the defendants filed a motion in the Superior Court seeking "correction and/or modification of the record." Specifically, the defendants identified eight documents that they contended should be included in the record, and asserted that a box in the office of the clerk of the Superior Court contained additional documents. A judge other than the trial judge allowed the motion in part and denied it in part.[51]

The motion judge allowed the motion insofar as it sought to add four of the eight documents specified by the defendants.

---

support a conclusion that FCC's conduct constituted unfair trade practices, we need not (and do not) express any view on the judge's conclusion that an attorney may not assert a claim against a former client under G. L. c. 93A.

[50] To the extent that the judge's reconstruction of the expert's testimony differs from the expert's affidavit describing his proposed trial testimony, we note simply that it is not unusual for trial testimony to vary from what a witness or the parties may have anticipated; we do not view any such variance to stand as evidence that the testimony was reconstructed falsely.

[51] During the intervening period, the trial judge had been appointed to this court.

We agree with the motion judge that the remaining four documents should not be included in the record.[52] We also agree with the motion judge that a vague reference to a box of unspecified documents furnished no basis to conclude that the additional documents should be included in the record on appeal.

The defendants further sought to "correct" the record, claiming that the official transcript contained various errors.[53] The judge properly denied the motion in its principal respects.[54] The purpose of an official transcript is to eliminate disputes between interested parties regarding the record of the proceedings. A party's self-serving and uncorroborated assertions of what transpired at trial cannot serve as grounds to contend that the official record of the proceedings, prepared by a neutral court official, was falsified.

c. *Motion to strike.* After the defendants filed their principal briefs and record appendix, the plaintiffs filed a motion with the single justice, seeking to strike various materials from the record appendix. The single justice denied the motion as to most of the materials, but allowed it as to some. We discern no error in the ruling of the single justice, with one exception.[55] On December 27, 2005, Melita filed a motion in the Superior Court, seeking to vacate the judgment under Mass.R.Civ.P. 60(b)(1), (4), and (6),

---

[52]The excluded documents consist of proposed amended complaints attached to motions to amend filed in the United States District Court for the District of Massachusetts while the case briefly was pending there. No action was ever taken on the motions to amend, either in the Federal District Court or following return of the case to the Superior Court.

[53]The defendants contended that the transcript omitted objections by Casher to (i) the decision to allow jurors to wear costumes on Halloween, (ii) the handing out of candy to jurors by the plaintiffs' counsel, and (iii) the circulation of a "cast list" for a movie version of the trial. They also asserted that a statement made by Gilleran concerning Salem Suede's bankruptcy fraud was missing from the transcript. Finally, they noted that the expedited version of the transcript of one day was more complete than the final version of the transcript for that day (the final version omitted an "off the record" conference that was recorded in the expedited version).

[54]The judge allowed the motion to substitute the more complete expedited version of the transcript, but otherwise denied it.

[55]The materials struck included the proposed amended complaints described in the preceding section (the motions relating to which were never acted upon), a variety of newspaper articles published following conclusion of the trial, and several motions and affidavits filed after entry of the judgment and not before us in these appeals.

365 Mass. 828 (1974). Following denial of that motion, she filed a notice of appeal and the appeal was consolidated with the appeal from the judgment. The order of the single justice struck the motion (but not the accompanying memorandum in support of the motion). The motion is reinstated as part of the record.[56]

12. *May 1, 2007, order of the single justice (the companion case).* Substantially all of the claims of error raised in the appeal from the order of the single justice of May 1, 2007, are duplicative of errors claimed in the main appeal, and accordingly have been addressed in the preceding discussions. Melita asserts an additional error in the refusal of the single justice to remand the case to the Superior Court, based on her contention that the judgment is not final because it failed to adjudicate the amount due to Casher. The contention fails, for the reason that the pleadings include no request for such an adjudication.

13. *Disposition.* In appeal no. 06-P-1419, the judgment is affirmed. The orders of the trial judge reconstructing the record and denying the defendant's motion to correct or modify the record are affirmed. The orders of the single justice dated December 17, 2007, are modified so as to reinstate the motion of Melita Picciotto pursuant to Mass.R.Civ.P. 60(b) as part of the record on appeal. In all other respects, those orders are affirmed.

In appeal no. 07-P-842, the order of the single justice dated May 1, 2007, is affirmed.

*So ordered.*

---

[56]For the first time in her reply brief, Melita argued that the motion to vacate was erroneously denied. We are not required to consider arguments made for the first time in a reply brief. See *Truong* v. *Wong,* 55 Mass. App. Ct. 868, 878 (2002). In any event, there was no error. The motion was untimely insofar as it sought relief under Mass.R.Civ.P. 60(b)(1) and (4). Furthermore, Melita's argument demonstrates no legal error in the denial of the motion.