T. BUTERA AUBURN, LLC, & another[1] vs. ROSEMARIE
WILLIAMS & another[2] (and a companion case[3]).

No. 11-P-1230.

Worcester. May 1, 2012. - April 17, 2013.

Present: GREEN, GRAINGER, & RUBIN, JJ.

*Veterinarian. Contract,* Performance and breach, Damages. *Consumer Protection Act,* Unfair or deceptive act, Damages, Attorney's fees. *Damages,* Consumer protection case. *Practice, Civil,* Costs.

In a civil action arising from the sale of a veterinary practice, the judge did not err in denying the purchaser's motion for a directed verdict or judgment notwithstanding the verdict on a claim of breach of contract, where the jury could have inferred that the purchaser wrongfully retained certain payments due the seller. [501]

In a civil action arising from the sale of a veterinary practice, the judge erred in multiplying only damages related to a claim of violation of G. L. c. 93A, where, under the plain language of G. L. c. 93A, § 11, the judge was required to multiply the other damages arising out of the same transaction or occurrence as well. [501-503] GRAINGER, J., dissenting.

This court remanded for further proceedings an award of attorney's fees in a civil action alleging violation of G. L. c. 93A, § 11, where the record did not contain findings of fact permitting determination of the basis of the award [503-504]; for the same reason, this court remanded for further proceedings an award of attorney's fees and costs related to recovery of payments under a promissory note [508-509].

In a civil action arising from the sale of a veterinary practice, the judge properly granted summary judgment in favor of the seller on a claim for accelerated payment due under a promissory note, where the seller's breach of an asset purchase agreement did not constitute a breach of the promissory note that would excuse the purchaser's nonperformance, and where equitable principles did not estop the seller's claim of entitlement to acceleration based on the purchaser's default on the note. [504-506]

In a civil action arising from the sale of a veterinary practice, the judge did not err in denying the seller's motion for a directed verdict or judgment notwithstanding the verdict on a claim of breach of an asset purchase agree-

[1] S. Thomas Butera.

[2] Feline Health, Inc.

[3] Rosemarie Williams *vs.* T. Butera Auburn, LLC; Ted A. Sprinkle, Jr.; S. Thomas Butera; and Lance P. Sprinkle.

ment, where the jury could have inferred a breach of the asset purchase agreement's provision that the seller not impair the good will of the practice. [506-507]

In a civil action arising from the sale of a veterinary practice, the evidence was sufficient to support a finding that the seller engaged in unfair and deceptive practices. [507-508]

CIVIL ACTIONS commenced in the Superior Court Department on July 31 and August 23, 2007, respectively.

After consolidation, the breach of contract and G. L. c. 93A claims were tried before *John S. McCann*, J.; following trial, the remaining claims were heard by him on a motion for summary judgment.

*Stephen J. Waite* for T. Butera Auburn, LLC, & others.

*Jessica Parenti* for Rosemarie Williams & another.

RUBIN, J. These cross appeals stem from litigation over the sale of a veterinary practice. The issues appealed relate to breach of contract and G. L. c. 93A, § 11.

*Background.* Rosemarie Williams and Feline Health, Inc. (collectively, Williams), operated a feline veterinary practice in Auburn named The Cat Hospital of Auburn (TCH). TCH was licensed by the Department of Public Health to handle radioactive material, iodine-131 (I-131), in order to treat cats using radioactive chemicals. There are few veterinary practices in the Commonwealth that are licensed to conduct feline nuclear medicine, which arguably made TCH a valuable prospective acquisition for the purchasers, T. Butera Auburn, LLC, and S. Thomas Butera (collectively, Butera). The radioactive materials handling license listed TCH as the licensee, and "Rosemarie M. Williams, D.V.M.," as the supervisor and "Radiation Safety Officer." The parties signed an asset purchase agreement (APA), by which Butera purchased TCH's assets for $800,000 cash and a promissory note (Note) whereby Butera would pay Williams an additional $400,000 over fifteen years. As part of the transaction, the parties also signed an employment agreement, and Williams became employed by Butera on an at-will basis.[4] The APA contained a two-year noncompetition/nonsolicitation provision

---

[4]The employment agreement also imposed multiple responsibilities on Williams.

encompassing an area with a thirty-mile radius extending from TCH. This noncompetition clause proscribed the solicitation by Williams of Butera's clients and any action by Williams that would "directly or indirectly . . . impair the goodwill" or "the business reputation or good name" of Butera, or "be otherwise detrimental to" Butera.

In addition, under the APA, Butera was obligated to transmit to Williams certain monthly instalment payments (lab payments) made to the practice by a diagnostic laboratory company (lab company) with which TCH had a longstanding agreement (lab agreement). The lab payments constituted, in effect, a discount for bulk diagnostic business provided to the lab company. (Butera paid Williams eight such instalments; there was testimony, disputed by Butera, that it failed to remit six additional payments to Williams.)

While Williams sold the assets of TCH, she retained ownership control of the building where Butera operated its practice, as the sole stockholder of Fur Flying Realty Trust, the corporate property owner. Through this corporation, Williams became the de facto landlord of TCH, as evidenced by a lease signed by the parties (lease).

Viewing the evidence in the light most favorable to Butera, the jury could have found that Williams sold TCH to Butera while planning to prevent Butera from operating its lucrative radiation treatment center and to recapture that radiation treatment business for herself. Pursuant to the parties' employment agreement, Williams agreed to work as an employee at TCH after its sale. While doing so, however, she engaged in furtive and wrongful conduct aimed at harming Butera and TCH. Specifically, Williams made a deal with Veterinary Centers of America (VCA) to open an I-131 radiation treatment center at VCA's Westfield veterinary hospital (VCA Westfield). Without informing Butera of her plan to leave, she invited representatives from VCA to view the I-131 facility at TCH while she was still working there to see how it operated. She later stated in an electronic mail message to a VCA official that TCH workers did not "have a clue" about what she was doing.

After making her deal with VCA, instead of informing clients that she was leaving TCH to start her own practice, Williams

sent out an announcement to TCH's referral base that falsely stated that TCH's treatment center was relocating to VCA Westfield. In addition, she allowed this misrepresentation to be included on the VCA Westfield Web site, which stated that the "iodine and thyroid treatment center formerly at the Cat Hospital of Auburn, Massachusetts," would now be at VCA Westfield.

Without authorization, after selling TCH, Williams used TCH stationery to write to the Department of Public Health, without informing it that she no longer owned TCH, in order to secure an "amendment" of TCH's radioactive license to allow her to add the VCA Westfield facility as a licensed location. In the letter, she materially misrepresented that the TCH facility had been relocated and renamed. Subsequently, and again unbeknownst to Butera and without authorization, Williams then sent additional letters, all but one on TCH stationery, to the Department of Public Health, informing it falsely that the I-131 treatment center at TCH would be closing and requesting that its facility license be withdrawn.

The evidence supports a conclusion that these actions were all part of Williams's plan at the very time she signed the APA. Although the APA made clear that Butera was buying the whole of the TCH business, including the I-131 treatment center, Williams's counsel included language to exclude from the transaction Williams's "license to practice Nuclear Medicine." Although this is most reasonably read to refer to a personal license to engage in radiotherapy, Williams later used this language in her dispute with Butera, arguing that it referred to the very license that allowed TCH to handle radioactive materials.

When Williams announced that she was leaving her employment at TCH, Butera, its new owner, was unaware of Williams's plan and requested that she, as the owner of TCH's landlord, provide the Department of Public Health with the written permission necessary for TCH to continue the use of radioactive materials on site after her departure. Williams, however, refused, making it impossible for TCH to continue its I-131 practice in that space.

These unfair and deceptive acts allowed Williams to essentially recapture the entire I-131 portion of the TCH business that she had sold to Butera a year earlier. It was valuable: in the year

preceding Williams's departure from TCH, the I-131 business accounted for gross receipts of nearly $275,000.

In Williams's solicitation of referring veterinarians and in her letter requesting the Department of Public Health to revoke TCH's radioactive material handling license, Butera saw a breach of the APA. Butera then suspended payment to Williams on the Note. In response, Williams declared the Note to be in default and accelerated the balance. Williams sued Butera for defaulting on the Note. Shortly thereafter, Butera filed a separate action against Williams asserting breach of contract and violation of G. L. c. 93A, § 11, and the two cases were later consolidated. Williams filed counterclaims in Butera's action, including a claim that Butera had failed to remit the lab payments discussed above and also for recovery on the Note. A jury trial was conducted on all of Butera's claims and Williams's counterclaims, with the exception of the claims related to the Note. The claims related to the Note were decided on summary judgment.

The jury returned a verdict in favor of Butera on the claims of breach of contract and violation of G. L. c. 93A. The jury were given a special verdict sheet, which instructed the jury to avoid duplicative awards, so they would not and did not include any overlapping contract damages in the amount of damages awarded under c. 93A. On the verdict slip, the jury awarded Butera $87,500 in damages for breach of the APA. It also awarded Butera $13,000 in damages for violation of G. L. c. 93A. The jury were specifically asked if the c. 93A damages arose out of the same conduct as the breach of the APA. They found that the damages did so arise. The jury found that Williams's unfair and deceptive conduct was knowing and wilful.

The jury also found that Williams violated her employment agreement with Butera but found no resulting damages. The jury found for Williams on the counterclaim related to Butera's failure to remit lab payments, ordering Butera to pay $3,107.16. On the claims related to the Note, the judge awarded summary judgment in favor of Williams, ordering payment of the balance of the accelerated Note. Additionally, the judge awarded Williams $9,097.62 in collection costs pursuant to the terms of the Note. Under the multiple damages provision of G. L. c. 93A, § 11, the judge doubled the jury's $13,000 award to Butera to

$26,000. The judge also awarded Butera $80,000 in attorney's fees under c. 93A, subsequently reducing this amount to $33,120.

*Discussion.* 1. *Butera's appeal.* a. *Failure to remit lab payments.* Butera finds fault in the judge's failure to direct a verdict or judgment notwithstanding the verdict (JNOV) in its favor on the breach of contract counterclaim related to Butera's failure to remit lab payments to Williams. In reviewing both the denial of a motion for a directed verdict or JNOV, "[o]ur duty . . . is to evaluate whether anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be made in favor of the nonmovant." *O'Brien* v. *Pearson*, 449 Mass. 377, 383 (2007) (quotation omitted).

As previously discussed, under the APA, Butera was obligated to transmit certain monthly lab payments to Williams after Butera received them from the lab company. Williams testified that she entered into the agreement for payments with the lab company prior to the sale of TCH to Butera and had previously received payments from the lab company pursuant to this arrangement. Williams also testified that she received only eight payments after the sale to Butera and that no other remittances were made. The lab agreement itself and a document showing eight payments in the exact amount of the lab payments from Butera's parent company to Williams were also in evidence. Butera's witness testified that eight payments were made and that he had "no knowledge" of what happened to the other monthly payments. This same Butera witness also testified that the title "DVM" appeared on his affidavit, when in fact he was not a veterinarian. From this accumulated evidence, the jury could have disbelieved Butera's witness, inferred that the credits continued to be paid to Butera just as they had been before the sale, and that Butera wrongfully retained these additional payments. There was thus no error in the denial of Butera's motion for a directed verdict or JNOV.

b. *G. L. c. 93A damages.* Butera appeals the doubling of only $13,000 in c. 93A damages to $26,000. Butera asserts that G. L. c. 93A, § 11, required the judge also to double the entirety of the breach of contract damages — in this case $87,500.

General Laws c. 93A, § 11, inserted by St. 1989, c. 580, § 2, has provided since 1989 that "[f]or the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence regardless of the existence or nonexistence of insurance coverage available in payment of the claim." This provision applies to wilful or knowing violations of c. 93A that injure persons engaged in trade or commerce; identical language is included in the statute's consumer provision, G. L. c. 93A, § 9. Our construction of the statute in this case thus affects both sections.

The Supreme Judicial Court has construed the statute to mean what it says. It did so as long ago as *R.W. Granger & Sons, Inc.* v. *J & S Insulation, Inc.*, 435 Mass. 66, 84 (2001), where that court said that the judge had correctly calculated c. 93A damages by doubling an underlying judgment on a bond claim that was "separate and distinct from the G. L. c. 93A claim." And it did so recently, when it held that damages on an underlying negligence claim had to be multiplied under the plain language of the statute. See *Rhodes* v. *AIG Domestic Claims, Inc.*, 461 Mass. 486, 499-501 (2012). As the court explained in *Rhodes*, "[u]nder the plain language of the 1989 amendment, if a defendant commits a wilful or knowing c. 93A violation that finds its roots in an event or a transaction that has given rise to a judgment in favor of the plaintiff, then the damages for the c. 93A violation are calculated by multiplying the amount of that judgment." *Id.* at 499.

Thus, Butera is correct that, under the plain language of § 11, the underlying contract damages as well as the c. 93A damages therefore must be doubled. Indeed, determining whether they must be doubled under the statute is the only reason the jury were asked whether the c. 93A violation and the breach of conduct arose out of the same conduct, a question they answered in the affirmative.

As described above, the Supreme Judicial Court has repeatedly multiplied not only the damages on c. 93A claims, but those on other claims — even, in the case of *Rhodes, supra* at 502 n.23, a claim brought in a different complaint — where

they arose out of the same transaction or occurrence.[5] Of course, damages awarded in a freestanding, unrelated cause of action that happens to be tried with a c. 93A claim will not be subject to multiplication because there must be "a causal connection between a defendant's wrongful conduct and the resulting damages." *Cohen* v. *Liberty Mut. Ins. Co.*, 41 Mass. App. Ct. 748, 755 (1996). But that causal connection was found by the jury in answering the question on the special verdict form.[6]

c. *Attorney's fees.* A prevailing plaintiff is entitled to reasonable attorney's fees under G. L. c. 93A, § 11. *Linthicum* v. *Archambault*, 379 Mass. 381, 388 (1979). While the method for determining reasonable attorney's fees is not stated in the statute, this court has ruled that the judge is to use the "lodestar" method. *Ross* v. *Continental Resources, Inc.*, 73 Mass. App. Ct. 497, 515 (2009). The judge "should consider the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases." *Linthicum, supra* at 388-389. "The amount of the award for attorney's fees is within the 'broad discretion of the trial judge.' " *Tarpey* v. *Crescent Ridge Dairy, Inc.*, 47 Mass. App. Ct. 380, 392 (1999), quoting

---

[5]Indeed, twenty years ago, in the very first case this court heard addressing the statutory language at issue here, a case just like this in which a plaintiff sought a multiple of a judgment on a "contract claim based on the same wrong" as the c. 93A judgment, we said, "[t]here is no question that the amendment to § 11 affects the measure of liability." *Greelish* v. *Drew*, 35 Mass. App. Ct. 541, 544 (1993). In this case, the amendment would subject the defendant to significantly increased damages." *Ibid.* We did not apply the amendment in that case, based on our conclusion that it should not be applied retroactively to cases arising prior to, but pending, at the time of its enactment.

[6]We do not read our dissenting colleague to disagree with any of the legal principles we have articulated. He notes that the jury could have found that the breach of contract and the G. L. c. 93A violation arose "from a common underlying occurrence," *post* at 510-511, and that, in such circumstances, the contract damages, as well as the c. 93A damages, would be subject to multiplication. The jury found just that, concluding explicitly that the contract violation did arise out of the same unfair and deceptive conduct that supported the award of damages under G. L. c. 93A. Under the settled principles of law on which we and our dissenting colleague agree, the damages awarded on the contract claim thus are subject to multiplication.

from *DiMarzo* v. *American Mut. Ins. Co.*, 389 Mass. 85, 106 (1983).

We do not have the benefit of judicially crafted findings of fact to determine the basis for the award, either before or after the reduction in amount from $80,000 to $33,120. "[T]o evaluate a fee award, we must have some 'indication' of the court's 'thought processes and how he structured the award.' " *Massachusetts Eye & Ear Infirmary* v. *QLT Phototherapeutics, Inc.*, 552 F.3d 47, 74 (1st Cir. 2009), quoting from *Peckham* v. *Continental Cas. Ins. Co.*, 895 F.2d 830, 842 (1st Cir. 1990) (interpreting c. 93A). For this reason, we must remand the case for findings of fact on the c. 93A attorney's fees awarded to Butera.

d. *Promissory note.* Butera urges us to reverse the judge's grant of summary judgment in favor of Williams on the issue whether the Note was properly accelerated. "We review a grant of summary judgment de novo, construing all facts in favor of the nonmoving party." *Miller* v. *Cotter*, 448 Mass. 671, 676 (2007).

An instrument, such as the Note here, must meet certain requirements in order to be considered negotiable and thereby governed by the Uniform Commercial Code. G. L. c. 106, § 3-102(*a*). It must be (i) an unconditional promise to pay a fixed amount of money; (ii) it must be payable on demand or at a certain time; (iii) it must be payable to order or bearer; and (iv) it generally must not state any undertaking other than the payment of money. G. L. c. 106, § 3-104(*a*). A note is not made conditional simply because it references "another writing for a statement of rights with respect to collateral, prepayment, or acceleration." G. L. c. 106, § 3-106(*b*). Also, "[t]he issuer of a note . . . is obliged to pay the instrument (i) according to its terms at the time it was issued or, if not issued, at the time it first came into possession of a holder." G. L. c. 106, § 3-412. It is not disputed that in this case the Note met the statutory requirements of negotiability.

Under the Note, Butera waived any "defense, offset or counterclaim"; it was thus unconditional. The Note's reference to the APA is exclusively an unremarkable recitation of consideration underlying the promise to pay.

Butera relies on § XI, par. F, of the APA to argue that Williams's violation of the APA, if proved, would excuse his obligations under the Note. That paragraph states in full:

> "*Related Agreements.* Once executed, the agreements identical to those annexed hereto as Exhibits . . .[7] shall be considered part and parcel of this Asset Purchase Agreement. A default in the performance required under any one of such agreements shall also constitute a default under this Asset Purchase Agreement."

This language states unambiguously that a default of obligations contained in the referenced documents (presumably intended to be attached) would also constitute a default of the APA itself. It does not, however, state the converse, namely that a violation of the APA would be a violation of the security agreement, the employment agreement, the lease, the guaranty of payment, or, pertinent here, the Note. To be sure, the Note, the APA, and the other attached agreements, including the lease, the security agreement, and the guaranty of payment, are deeply intertwined. The Note specifies that its purpose is to advance funds for Butera's purchase from Williams of assets described in the APA, which refers, inter alia, to the good will of TCH. And, among the bases for default (and acceleration) in the Note are not only nonpayment, but also default on the lease. Thus, a breach of at least one agreement extrinsic to the Note amounts to a breach under the Note. This latter term, of course, is one that is of interest only to Williams; it would presumably be irrelevant to a holder in due course. Nonetheless, none of the agreements indicates that a breach of the APA amounts to a breach of the Note, one that might excuse Butera's nonperformance.

Alternatively, Butera asserts that equitable principles estop Williams's claim of entitlement to acceleration based on default on the Note. Were Williams a holder in due course, such an argument might be readily dismissed. But she is not. "As between the original parties . . . a promissory note is nothing

---

[7] In fact, no exhibits were attached to the APA. The parties have stipulated that this is not an issue in the case.

more than a written contract for the payment of money." *Appliances, Inc.* v. *Yost*, 181 Conn. 207, 210 (1980). "Since the note [is] a contract, the fundamental rules governing contract law are applicable." *Id.* at 211. Butera, as the maker of the Note, thus may have equitable defenses against the lender that it would not have against a holder in due course.

In this case, Williams took actions that damaged the business of TCH, using means that no holder in due course would have had. Having represented that she was selling the business to the borrower, Butera, and having thereby induced Butera to enter the agreement memorialized in the Note, Williams, the jury found, here sought to recapture for herself the value of what she sold by unlawfully undermining TCH's lucrative nuclear medicine practice.

If Butera could demonstrate that the damaged business itself was supposed to generate the income from which the debt to Williams was to be repaid, Williams might well be estopped from obtaining judicially compelled acceleration on the basis that the Note was breached when payments were not subsequently made on time by the borrower. In this case, however, there was no proof that the source of the payments on the Note was known to Williams to be the business with which she interfered. Nor was there any allegation that the injury she wrought affected the ability of Butera to make payments under the Note. In such circumstances, we think Butera has not met its burden to demonstrate an entitlement to invoke an equitable defense.[8] Williams's motion for summary judgment therefore was properly allowed.

2. *Williams's appeal.* a. *Breach of contract.* Williams asserts error in the judge's failure to grant a directed verdict or JNOV in her favor on Butera's claims for breach of the APA and the employment agreement. Under the APA, Williams was not to

> "take any action or make any statement the effect of which would be, directly or indirectly, to impair the goodwill of [Butera] . . . or be otherwise detrimental to [Butera], including any action or statement intended, directly or indirectly, to benefit a competitor of [Butera]."

---

[8] We note as well that Butera acted unilaterally to cease payments on the Note, and made no attempt to obtain injunctive relief authorizing that course.

Butera introduced in evidence a printout from the Web site of the VCA Westfield practice that Williams joined. The Web site stated the following: "[the VCA Westfield practice] welcomes Dr. Rosemarie Williams in the relocation of her iodine and thyroid treatment center formerly at The Cat Hospital of Auburn, Massachusetts." Evidence also showed that there was a dearth of practices conducting feline nuclear medicine to whom other veterinarians could refer feline patients and that TCH had developed a positive reputation in this field. Moreover, there was testimony from Williams that, prior to leaving Butera's employ, she compiled a list of veterinarians who referred patients to TCH for nuclear medicine treatment, and that she sent the veterinarians on that list flyers about a new nuclear medicine practice she was establishing.

Good will can be defined as, "fundamentally, the value of an enterprise over and above the value of its net tangible assets, a value that may derive from the allegiance of customers, prolonged favorable relations with a source of financing, and the like." *Donahue* v. *Draper*, 22 Mass. App. Ct. 30, 35 (1986) (citation omitted). The jury could have inferred a breach of the APA's good will provision through the evidence of Williams's compiling of TCH's referring veterinarian information and the Web site posting stating that TCH's nuclear medicine practice had moved to VCA Westfield.[9] Consequently, there was no error in the judge's denial of Williams's motions for a directed verdict or JNOV.[10]

b. *Sufficiency of G. L. c. 93A claim.* Williams also alleges that there was insufficient evidence to find a violation of G. L.

---

[9]Williams states that the APA specifically excluded her license to handle radioactive material, a necessity to practice nuclear medicine, from the assets to be conveyed. Even if this were true, and the jury verdict implies a rejection of this reading of the APA, this would not change our analysis. What allowed the jury to infer a breach of the APA's good will provision was Williams's carrying away of referral information and the untrue statement to potential referrals, through the Web site, that TCH's nuclear medicine practice had moved to VCA Westfield, not that Williams took her license there.

[10]The judge was also correct in not granting a directed verdict or JNOV regarding the breach of employment agreement. The agreement required Williams's best efforts in diligently promoting Butera's interests. As stated, there was evidence that Williams recorded the names of referring veterinarians while an employee of TCH, and that she solicited their business for her new practice.

c. 93A because neither a breach of contract alone nor an employer-employee relationship can support a finding of unfair and deceptive practices. Williams is correct in that a breach of contract standing alone is not sufficient as a matter of law to support a c. 93A violation. See *Zabin* v. *Picciotto*, 73 Mass. App. Ct. 141, 169 (2008). "Instead, to rise to the level of a c. 93A violation, a breach must be both knowing and intended to secure 'unbargained-for benefits' to the detriment of the other party." *Ibid.*, quoting from *NASCO, Inc.* v. *Public Storage, Inc.*, 29 F.3d 28, 34 (1st Cir. 1994). The untrue Web site announcement that TCH's nuclear medicine practice had moved to VCA Westfield warranted the judge's denial of Williams's motion for a JNOV. The jury reasonably could have found that this act was knowing and was intended to deprive TCH of its referring veterinarian base.[11] From the evidence, the jury could infer that Williams knew she sold the nuclear medicine practice to Butera in Auburn, yet she caused the Web site of her new practice to state falsely that the TCH practice had relocated from Auburn to Westfield. The employer-employee relationship argument is without merit as there was evidence that Williams knowingly breached the APA's good will provision as the seller of TCH, not as an employee of the business. See *Specialized Technology Resources, Inc.* v. *JPS Elastomerics Corp.*, 80 Mass. App. Ct. 841, 846-847 (2011).

 c. *Promissory note — costs of collection.* Finally, Williams challenges the adequacy of the $5,000 award in attorney's fees and costs of her action on the Note, asserting that Butera required her to litigate the contract claims in order to prevail on the Note. We disagree. As stated, Williams's ability to bring a claim or secure a judgment on the Note was independent of Butera's claims, and therefore this argument is without merit.[12] However, for the same reasons set forth, *supra*, regarding the award of at-

---

[11]Williams also appeals the jury's damages award against her as overly speculative, and challenges the qualifications of Butera's damages witness. Williams cites no decisional or statutory law for these arguments; therefore, this issue does not rise to the level of appellate argument. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

[12]Williams cites *Penney* v. *First Natl. Bank*, 385 Mass. 715 (1982), for the argument that a judge will award fees for all claims connected to collection on a note. This case is unavailing to Williams because in *Penney*, the judge

torney's fees to Butera in connection with c. 93A, on remand the judge should also provide adequate findings on the costs awarded in connection with the Note.

*Conclusion.* The judgments are affirmed in part and vacated in part, and the case is remanded for further proceedings in accordance with this opinion.

*So ordered.*

GRAINGER, J. (dissenting in part). I conclude on this record that the judge was correct in doubling the jury award of $13,000 in G. L. c. 93A damages to $26,000. I do not read the fifth paragraph of G. L. c. 93A, § 11, inserted by St. 1989, c. 580, § 2 (amendment),[1] as requiring the judge also to double the entirety of the breach of contract damages — in this case $87,500. Accordingly, I respectfully dissent from that portion of the majority decision.

The amendment is certainly not a model of legislative clarity.[2] It is clear, however, that the amendment does not support doubling damages separately awarded on other claims, albeit arising out of related facts, simply because a lawsuit, predictably, includes a claim under c. 93A.[3]

The problem in this case, as in so many others, is distinguish-

---

specifically ordered that no execution on the note would issue until the other claims in the case were resolved. *Id.* at 723. That interdependent situation did not occur in the present case.

[1] The amendment provides as follow: "For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence regardless of the existence or nonexistence of insurance coverage available in payment of the claim."

[2] Indeed, we have previously observed that "it is unclear what was meant by the [amendment's] phrase 'all claims arising out of the same and underlying transaction or occurrence.' " *Cohen* v. *Liberty Mut. Ins. Co.*, 41 Mass. App. Ct. 748, 753 (1996). The Supreme Judicial Court has noted that the language was added by the Legislature in response to cases where courts "limited the measure of multiple damages against a bad faith insurer to the plaintiff's 'loss of use damages, measured by the interest lost on the amount the insurer wrongfully failed to provide the claimant.' " *R.W. Granger & Sons, Inc.* v. *J & S Insulation Inc.*, 435 Mass. 66, 83 (2001).

[3] The disproportionate effect of doubling or tripling a multimillion dollar award of which only a small fraction is deemed attributable to unfair and deceptive conduct, even though all claims arise from "the same underlying

ing a claim that arises out of the "same underlying transaction or occurrence" from one that merely appears in an ongoing narrative of successive occurrences. Fortunately the jury provided their own view in this particular case, and it is not our province to reverse that decision.

To the extent that the plaintiffs (collectively, Butera) sought a multiple damages award, it was their burden to establish that the conduct of the defendants (collectively, Williams) was unfair or deceptive, or arose from the same "transaction or occurrence." Butera's lawsuit complained of numerous acts by Williams. Some of these acts were directly related to specific contract provisions and would otherwise not be considered actionable. For example, there was evidence that Williams sent letters to referral sources announcing her new practice. This was not inherently unfair or deceptive, and would not have been actionable absent the contractual nonsolicitation clause, which is the very reason such clauses are negotiated. Other evidence, however, such as Williams's conduct in the role of landlord, had no direct relationship to the underlying transaction (the contract of sale) and could be viewed as entitling Butera to damages only because the actions were unfair or deceptive.

Still other evidence might be viewed as falling in either category: For example, Williams's new veterinary practice was outside the geographic restriction of thirty miles agreed upon by the parties and, arguably, not a contract breach. On the other hand, the jury could have concluded on this record that Williams undertook competitive acts which produced an intended effect within the thirty miles or that, for example, the statements on the new Web site about her ongoing practice arose from the same "underlying" occurrence.

In sum, the jury had considerable latitude to characterize each act as unfair and deceptive, or as exclusively a breach of contract, or as arising — or not arising — from a common underlying occurrence. In considering the evidence, the jury found that some, but far from all, of the damages incurred by

transaction," is self-evident. The Supreme Judicial Court has recognized the potential substantive due process implications of such a result. *Rhodes* v. *AIG Domestic Claims, Inc.*, 461 Mass. 486, 503-504 (2012). See *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 574-585 (1996).

William's contract violations arose from the same occurrences as those giving rise to c. 93A damages. In this context it bears repeating that a breach of contract standing alone is not sufficient as a matter of law to support a c. 93A violation. See *Zabin* v. *Picciotto*, 73 Mass. App. Ct. 141, 169 (2008). In the jury's determination, Butera satisfied its burden on the issue of identical underlying transactions to the extent of $13,000 in damages, but not more.[4]

If Butera wished to have the jury express the view that the entirety of the breaching conduct as well as the unfair or deceptive conduct under c. 93A constituted, or arose from, the same occurrence, the verdict slip could have framed that specific question. My colleagues assign significance to the form of the special verdict slip, to which Butera agreed, because it instructed the jury not to duplicate damages. In my view only a contrary instruction, directing the jury to actually award duplicate damages, would have been significant — as palpable error. See *Calimlim* v. *Foreign Car Center, Inc.*, 392 Mass. 228, 235-236 (1984).[5] Here the jury were allowed, with Butera's consent, to determine whether damages arising from various acts could be distinguished on the basis of underlying transactions, and they did so: they calculated Butera's total damages as $100,500, comprised of $87,500 resulting from the contract breach and $13,000 resulting from Williams's violation of c. 93A.

Because the amendment does not require separate awards on separate claims to be multiplied merely because they are ac-

---

[4] I do not necessarily disagree (or agree) with the majority's characterization of Williams's entire behavior as a comprehensive premeditated scheme to deprive Butera of any and all benefit from the purchase of the practice. As noted above, such a finding is the jury's — and not ours — to make.

[5] The actual language of the admonition contained in the jury slip is instructive:

> "Caveat: There are numerous claims and counterclaims in this case. In some instances *some claims are made in the alternative, meaning there may be alternative theories to recovery on the same claim.* Any damages you may assess, if any, should not be duplicative of other claims. In other words, the questions on this verdict slip which make reference to the issue of duplication *should allow you to return a verdict which will avoid a double recovery for what you find to be the same claim.*" (Emphasis added.)

companied by the inevitable claim of a violation of c. 93A, the amended summary judgment was correct and should be affirmed.