RANDYE M. HOLLAND, trustee,[1] & others[2] *vs.* EMIL JACHMANN & another[3] (No. 1).

No. 13-P-280.

Hampden. January 8, 2014. - May 14, 2014.

Present: KANTROWITZ, VUONO, & SULLIVAN, JJ.

*Consumer Protection Act,* Unfair or deceptive act, Attorney's fees. *Practice, Civil,* Consumer protection case, Attorney's fees. *Damages,* Attorney's fees. *Contract,* Performance and breach, Agreement not to compete. *Attorney at Law,* In-house counsel.

At the trial of a civil complaint, there was ample evidence to support the Superior Court judge's finding that the defendants' pattern of conduct rose to the level of a violation of G. L. c. 93A. [296-297]

This court concluded that an award of attorney's fees under G. L. c. 93A is permissible, in the discretion of the judge, for the services of in-house counsel. [297-299]

In a civil action alleging, among other things, a violation of G. L. c. 93A, the Superior Court judge did not abuse his discretion in calculating the amount of an award of attorney's fees to the plaintiff corporation for work performed by its in-house counsel, where, although the better practice would have been for in-house counsel to keep contemporaneous time records, the documentation he provided, combined with the judge's firsthand knowledge of the case and in-house counsel's services, provided a nonspeculative basis for calculating fees. [299-300]

CIVIL ACTION commenced in the Superior Court Department on July 27, 2006.

The case was heard by *Peter A. Velis,* J.; postjudgment motions regarding attorney's fees were heard by him; and entry of a final amended judgment was ordered by him.

*Susan E. Stenger* (*Thomas T. Reith* with her) for the defendants.

---

[1] Of the Randye M. Holland and Stanley M. Holland Trust.

[2] Stanley M. Holland, trustee of the Randye M. Holland and Stanley M. Holland Trust; Leemon Family LLC; Achaian, Inc.; and Omniglow, LLC.

[3] Cyalume Technologies, Inc.

*George Stanbury,* of California, for the plaintiffs.

KANTROWITZ, J. Of significance, we are asked whether attorney's fees for legal work performed by in-house counsel may be awarded under G. L. c. 93A. We hold that, in the discretion of the trial judge, such fees may be awarded.

The plaintiffs (sometimes referred to collectively as Omniglow) brought the present action against Cyalume Technologies, Inc. (Cyalume), and Emil Jachmann, its chief executive officer (collectively, defendants), seeking to remedy the defendants' efforts to undermine the plaintiffs' business. After a seventeen-day, jury-waived trial, the judge found the defendants liable for numerous breaches of contract, conversion, and violations of G. L. c. 93A. Several posttrial proceedings ensued, concluding in a final judgment entered on August 1, 2011, largely in favor of the plaintiffs. Following the disposition of the postjudgment motions, an amended final judgment was entered on July 12, 2012.

On appeal, the defendants raise many issues. While involved and complicated, ultimately they are of a garden variety, albeit weed-infested, and best resolved via an unpublished memorandum and order pursuant to our rule 1:28 that is also being issued today. *Holland* v. *Jachmann (No. 2), post* 1120 (2014). As such, we concern ourselves here only with the c. 93A issues.

*Background.* This business dispute arose out of a complicated transaction through which the Omniglow Corporation, a manufacturer of light sticks and other luminescent products, was effectively split into two companies.

In late 2005, the company now known as Cyalume purchased the profitable segments of the Omniglow Corporation consisting principally of sales in the government, military, and safety (GMS) markets. As a condition of the closing of the stock purchase agreement, Omniglow Corporation was required to divest itself of all the assets and liabilities related to the unprofitable "rest of glow" (ROG) segments.

On January 23, 2006, the day the sale closed, the plaintiffs purchased, pursuant to the terms of the ROG purchase agreement, the ROG segments and the right to the Omniglow name. The plaintiffs, the judge found, planned to turn the ROG segments around by manufacturing all products at a lower cost at

their facility in Mexico as soon as possible. On the same day, Omniglow and Cyalume also entered into a series of contracts defining their rights and obligations to each other going forward, including as herein relevant, a lease agreement, a manufacturing agreement, an information technology (IT) sharing agreement, and a noncompetition agreement prohibiting Cyalume from competing in the ROG business and from soliciting or taking away ROG customers and business.

Although a mutually supportive working relationship was anticipated, the relationship between Omniglow and Cyalume quickly soured. Cyalume missed a deadline for submitting an audited income statement that was required for the distribution of escrow funds sorely needed by Omniglow. It also withheld two pieces of equipment — a six-inch mold and a "mini-wrapper" used to wrap Speculite and Vizilite light sticks in foil — essential for Omniglow's business. Cyalume was obligated to provide these pieces of equipment pursuant to the ROG purchase agreement, yet refused to do so. Without the mold and the mini-wrapper, Omniglow was compelled to purchase products from Cyalume that Omniglow could have otherwise manufactured itself for less money. Cyalume, the judge found, also blocked Omniglow from resolving title disputes through the special procedure called for in the ROG purchase agreement.[4]

This pattern continued with the extrusion system integral to the manufacture of necklaces, bracelets, and other smaller tubular devices, "which are a major part of the Omniglow, LLC product line." In light of the unambiguous designations in the schedules to the ROG purchase agreement, the judge found that Cyalume's

---

[4]On this matter, the judge found that "[b]ecause separating the ROG and GMS segments was complex and it was understood that some inventory and equipment could not easily be classified exclusively as an asset of either set of segments, the ROG Purchase Agreement required the parties to negotiate in good faith any additions or corrections to the ROG equipment schedules to make them accurate and complete." In the event of an impasse, the parties were required to submit any disagreements about the schedules arising before August 31, 2006, to John Friedson, the Omniglow Corporation executive who made the original allocation decisions. Stanley Holland, an Omniglow principal, timely invoked the remedy provision of the ROG purchase agreement seeking a quick resolution to the equipment ownership disputes with Cyalume. Friedson, the judge found, was willing to serve as the arbiter until he received an electronic mail message from Cyalume's attorney threatening him with a lawsuit.

ownership claims to Omniglow's equipment were not made in good faith.

Cyalume also converted other assets dedicated for use in the ROG business that belonged to Omniglow. First, Cyalume withheld 1.63 million adhesive strips from Omniglow used exclusively by Omniglow to manufacture its Speculite product. Cyalume not only denied the request of Watson Pharmaceuticals (Watson), one of Omniglow's major customers, to replace 45,000 defective strips, but also required Watson to purchase more than five times the amount needed at three times the cost.[5] On two occasions, because Cyalume had not released the adhesive strips that rightfully belonged to Omniglow, Omniglow was forced to buy those strips back from Cyalume at an inflated price.

The judge found other breaches by Cyalume. Based on credibility determinations, the judge found that Michael Bielonko, Cyalume's chief financial officer, instructed Michelle Ruby, Cyalume's IT chief, to prevent Omniglow employees from accessing important documents and information stored in the computer system. The judge also found that Bielonko and Jachmann personally instructed Ruby to delay resolution of Omniglow's computer glitches, needlessly prolonging the problems. The judge found that these wilful and intentional breaches of the IT sharing agreement disrupted and jeopardized the business of Omniglow and that this "disconcerting" conduct of Cyalume's top executives was intended to further the scheme to debilitate Omniglow.

Cyalume intercepted and filled a purchase order intended for Omniglow and sold novelty light sticks that it was forbidden to sell under the noncompetition agreement to two customers, Trevco and Coghlan's. As the judge found, the light sticks sold to Coghlan's "were unmistakably novelty items due to their packaging." While there may have been some confusion about Cyalume's right to sell to Trevco, the judge concluded that the sales to Coghlan's were, in contrast, wilful and knowing violations of c. 93A.

As time passed, Cyalume's conduct toward Omniglow became

[5]Omniglow reimbursed Watson for the amount charged by Cyalume.

even more threatening and damaging. After wrongfully evicting Omniglow from a shared West Springfield facility, Cyalume refused to turn over two telephone numbers dedicated for use by ROG customers that rightfully belonged to Omniglow. These telephone numbers were of significant financial value to Omniglow, as customers often used them to reorder products. Cyalume subsequently failed to refer some novelty customers to Omniglow.[6] Moreover, using one of Omniglow's telephone numbers, Cyalume advertised itself as a novelty manufacturer in the Yellow Pages telephone directory, actively soliciting ROG business in "flagrant" breach of both the ROG purchase and noncompetition agreements. Because there could not have been any confusion about Omniglow's right to these telephone numbers, the judge concluded that their withholding was done in bad faith and was intended to derail the business of Omniglow.

Jachmann threatened one of the principals of ONTI, the only legitimate supplier of chemicals to Omniglow (other than Cyalume), with a baseless lawsuit unless he stopped selling to Omniglow. The intent of the threat, the judge found, was to coerce Omniglow into buying chemicals from Cyalume on terms that were not favorable to Omniglow.

On the c. 93A count, the judge found that the actions undertaken by Cyalume and Jachmann were part of an effort to undermine Omniglow's business interests, and that this pattern of conduct rose to the level of a c. 93A violation. The defendants appealed.

*G. L. c. 93A.* While the defendants contest c. 93A liability, we need not tarry long on the many reasons a finding of a c. 93A violation was appropriate. Much more sinister conduct than simple breaches of contract was proved here. Summing up the defendants' culpability, the judge found and ruled that "[t]he evidence presented at trial in this case disclose[d] a disturbing pattern of egregious conduct by the defendants, not only in disregarding the contractual rights of Omniglow, LLC under the ROG Purchase Agreement and other contracts, but in engaging in conduct unmistakably aimed at undermining Omniglow,

---

[6] The judge found that although Omniglow lost customers and orders as a result of Cyalume's conduct, Omniglow was unable to quantify the value of this loss.

LLC.'' The objectionable conduct found unfair included "flagrant" contractual breaches where no confusion about rights and duties existed as well as bad faith breaches intended to secure advantages for Cyalume. See *Vita* v. *Berman, DeValerio & Pease, LLP*, 81 Mass. App. Ct. 748, 755-756 (2012). The judge's conclusion that eight separate acts rose to the level of violations of G. L. c. 93A was amply supported by the evidence. See *Casavant* v. *Norwegian Cruise Line Ltd.*, 460 Mass. 500, 503 (2011).[7]

*Attorney's fees under c. 93A.* The defendants argue that the judge improperly awarded attorney's fees for legal work performed by George Stanbury, in-house counsel to Omniglow.[8] The question whether in-house counsel fees are "incurred" for the purposes of an award of attorney's fees under G. L. c. 93A is, surprisingly, a novel one.

"General Laws c. 93A, § 11, sixth par., authorizes the award of attorney's fees 'incurred in connection with said action' (i.e., the G. L. c. 93A action), but not for other actions." *Drywall Sys., Inc.* v. *ZVI Constr. Co.*, 435 Mass. 664, 673 (2002). "The entire tenor of G. L. c. 93A is to award attorney's fees and costs to a party who succeeds in demonstrating that a defendant has violated G. L. c. 93A, § 2(*a*)." *Barron* v. *Fidelity Magellan Fund*, 57 Mass. App. Ct. 507, 517 (2003), quoting from *Commonwealth* v. *Fall River Motor Sales, Inc.*, 409 Mass. 302, 316 (1991). "Such a view is consistent with 'the scheme of the statute and the Legislature's manifest purpose of deterring misconduct.' " *Ibid.*

Here, the defendants urge that legal fees are not recoverable under c. 93A for in-house counsel's services. They argue that because Stanbury, a salaried employee, failed to bill Omniglow for his services, legal expenses were not "incurred" for the purposes of c. 93A and that, furthermore, the value of his work was purely speculative and undocumented.

---

[7]The judge did not rule against the defendants on all issues, e.g., a breach of the lease by denying access to the leased premises, and a related c. 93A claim.

[8]Fees were also awarded for services rendered by Robert Aronson, a commercial litigator based in Springfield, who assisted Stanbury in the case. The defendants have not challenged the separate award of $71,596.84 for Aronson's fees.

Conversely, the plaintiffs argue that "the purpose of award-ing [attorney's] fees is essentially punitive and there is no reason to relieve defendants from the consequences of their wrongful acts merely because Stanbury was in-house counsel and not paid on an hourly basis."

The judge rejected the defendants' arguments, grounding his decision primarily on principles of fairness, the public policy served by fee awards, and case law upholding statutorily mandated fee awards even in the absence of billing. See *Lincoln St. Realty Co.* v. *Green*, 374 Mass. 630, 632 (1978) ("Statutory authorization to award attorney's fees to the prevailing party in certain types of actions primarily serves the interrelated purposes of encouraging private enforcement of particular laws chosen by the Legislature, deterring illegal conduct in connection with these laws, and punishing those who violate these laws"); *Linthicum* v. *Archambault*, 379 Mass. 381, 388 (1979) ("As to at-torney's fees, the law is quite clear that when attorney's fees are statutorily authorized legal services organizations are entitled to receive such awards" [quotation omitted]).

We agree with the judge's reasoning. On a practical level, as the judge observed, every hour spent on the Cyalume litigation was an hour when Stanbury's efforts were directed away from other legal matters facing Omniglow. Therefore, having in-house counsel engaged in the present suit had a concrete financial impact on Omniglow, which we conclude "incurred" a cost. In addition, the judge's description of Stanbury as having "actively participated at all stages of this matter as lead counsel" further supports his award of fees. Compare *Arthur D. Little Intl., Inc.* v. *Dooyang Corp.*, 995 F. Supp. 217, 225 (D. Mass. 1998) (no award of attorney's fees for in-house counsel who "was merely the client," and who had little or no participation in the trial proceedings).

We also consider the policy underlying c. 93A. To deny at-torney's fees to Omniglow in this case simply because it chose to utilize its own in-house counsel would undercut the deterrent purposes of c. 93A and would implicitly reward the defendants for their questionable behavior. For these reasons, we conclude that an award of attorney's fees under c. 93A is permissible, in the discretion of the trial judge, for the services of in-house

counsel. This interpretation furthers the broad remedial purpose of c. 93A. See *Kraft Power Corp.* v. *Merrill*, 464 Mass. 145, 164-165 (2013).

Turning to the calculation of Stanbury's fees,[9] we find no abuse of the judge's broad discretion in the amount of the award, in spite of our reservations with the documentation provided in support of the fee request. See *T. Butera Auburn, LLC* v. *Williams*, 83 Mass. App. Ct. 496, 503-504 (2013). Trial judges are "in the best position to determine how much time was reasonably spent on a case, and the fair value of the attorney's services." *Fontaine* v. *Ebtec Corp.*, 415 Mass. 309, 324 (1993).[10]

Here, the judge based the award on Stanbury's "demonstrated competence and experience, the length of the trial, the difficulty of the legal and factual issues, the enormous amount of time necessarily expended by Stanbury in trial preparation, and the plaintiffs' degree of success." As the judge noted, Stanbury and Aronson achieved great success in the case, obtaining substantial damage awards on most of the c. 93A claims. The judge's decision demonstrates that he applied the appropriate factors in arriving at what he considered a reasonable fee award.[11] See *Linthicum*, 379 Mass. at 388-389 (proper considerations include "the nature of the case and the issues presented, the time and

---

[9]Stanbury was retained by Omniglow in and around October, 2006. At the time, he was in private practice in Santa Monica, California. In July, 2007, Stanbury became general counsel for Omniglow.

[10]To calculate appropriate in-house counsel fees, other jurisdictions have adopted either the market rate approach (computing fees based on what would reasonably be charged by outside counsel), or the cost-plus analysis (proportionate share of the attorney's salary, including cost of overhead, allocable to the matter in question). See *Milgard Tempering, Inc.* v. *Selas Corp. of America*, 761 F.2d 553, 558 (9th Cir. 1985) (adopting "modern trend" of market rate calculation); *Softsolutions, Inc.* v. *Brigham Young Univ.*, 1 P.3d 1095, 1107 (Utah 2000) (adopting cost-plus analysis). We hold that a judge may utilize either method in his or her discretion.

[11]As in-house counsel for Omniglow, Stanbury received an annual salary of $200,000. Prior to that position, Stanbury charged $350 per hour in private practice in the Santa Monica area. The judge found that $350 was a reasonable hourly rate for a highly experienced attorney working on similarly complex litigation in the Springfield area. That Aronson, another highly experienced attorney, charged a lower rate, $225 per hour, is of no consequence. To the extent the defendants challenge Stanbury's rate as incongruous, we see no abuse of discretion in light of the judge's description of Stanbury's role as lead counsel and the evidence concerning the range of rates in the Springfield area.

labor required, the amount of damages involved, the result obtained, the experience, reputation, and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases").

Stanbury's failure to provide contemporaneous timesheets, while concerning, was not an insurmountable impediment to the fee award. See *Handy* v. *Penal Insts. Commr. of Boston*, 412 Mass. 759, 767 (1992). In his certified fee application, Stanbury produced a month-by-month list of all time spent on the case with a brief but specific description of the services he provided each month. The judge found that more detailed records were unnecessary to show that the amount of time claimed was "eminently reasonable."[12] Stanbury knew in advance of the case that if the plaintiffs prevailed, a statutory fee award would be sought. While better practice would have been to keep contemporaneous time records, we conclude that the documentation Stanbury provided, combined with the judge's firsthand knowledge of the case and Stanbury's services, provided a non-speculative basis for calculating fees.[13] See *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 631 (1978) (plaintiffs properly awarded attorney's fees under c. 93A "notwithstanding the absence of evidence concerning time spent and the attorney's usual charge").

We conclude that, while the documentation provided to the judge was less than ideal, it was sufficient in this case to justify the award of fees.

*Amended final judgment*
*affirmed.*

---

[12]As the judge noted, the factually and legally complex case involved "numerous contracts, technology and sales, international production, voluminous business records, and a 17 day trial with 72 exhibits." Stanbury, moreover, took or defended eighteen depositions and did not charge for travel time.

[13]Ultimately, the judge awarded $152,906.25 for legal work performed by Stanbury, which appears reasonable given the damages awarded of over $2 million. Compare *Arthur D. Little Intl., Inc.* v. *Dooyang Corp.*, 995 F. Supp. at 225 (awarding $915,707 in attorney's fees on damages of $920,000). In arriving at the figure, the judge credited Stanbury's documentation, yet reduced the amount of his fees by twenty-five percent to reflect (i) the approximate amount of time spent on non-c. 93A segments of the case, and (ii) the time spent defending the c. 93A counterclaim.